Filed: May 6, 2003

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-2406
(CA-01-59)

Jean Fawcett,

Petitioner - Appellee,

versus

Colin McRoberts; Tammy McRoberts,

Respondents - Appellants.

O R D E R

The court further amends its opinion filed April 15, 2003, and amended April 18, 2003, as follows:

On page 12, second full paragraph -- the first sentence is deleted, and is replaced with the following:

> As Sheriff David Kelbie noted in his commentary to the Scottish Court of Sessions's opinion in <u>Donofrio v. Burrell</u>, 2000 S.C.L.R. 465 at 16 (1999), a parent "clearly" loses "[her] 'rights of custody' [under the Convention] if the other parent is awarded a residence order.

For the Court - By Direction

/s/ Patricia S. Connor

_____
                Clerk

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 01-2406
(CA-01-59)

Jean Fawcett,

Petitioner - Appellee,

versus

Colin McRoberts; Tammy McRoberts,

Respondents - Appellants.

O R D E R

The court amends its opinion filed April 15, 2003, as follows:

On the cover sheet, section 7, line 6 -- the counsel listing on brief "for Appellants" is corrected to read "for Appellee."

For the Court - By Direction

/s/ Patricia S. Connor
Clerk

PUBLISHED

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

JEAN FAWCETT,
    *Petitioner-Appellee,*

    v.                       No. 01-2406

COLIN MCROBERTS; TAMMY
MCROBERTS,
    *Respondents-Appellants.*

Appeal from the United States District Court
for the Western District of Virginia, at Lynchburg.
Norman K. Moon, District Judge.
(CA-01-59)

Argued: January 24, 2003

Decided: April 15, 2003

Before LUTTIG, MOTZ, and TRAXLER, Circuit Judges.

_____

Reversed and remanded by published opinion. Judge Motz wrote the opinion, in which Judge Luttig and Judge Traxler joined.

_____

**COUNSEL**

**ARGUED:** Patricia Emily Apy, PARAS, APY & REISS, P.C., Red Bank, New Jersey, for Appellants. Stephen John Cullen, MILES & STOCKBRIDGE, P.C., Towson, Maryland, for Appellee. **ON BRIEF:** Jamison G. White, MILES & STOCKBRIDGE, P.C., Washington, D.C.; Victor S. Skaff, III, GENTRY, LOCKE, RAKES & MOORE, Roanoke, Virginia, for Appellee.

_____

**OPINION**

DIANA GRIBBON MOTZ, Circuit Judge:

After Colin McRoberts and Jean Fawcett divorced, Mr. McRoberts moved from Scotland to Virginia with the couple's son, Travis. Ms. Fawcett filed a petition in federal court in Virginia requesting that the court order Travis's return to Scotland pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Convention"), and the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C.A. §§ 11601-11610 (West 1995). The district court granted Ms. Fawcett's petition and Mr. McRoberts has appealed. Because the district court erred in its interpretation and application of Scottish law, we reverse and remand to the district court for further proceedings consistent with this opinion.

I.

Mr. McRoberts and Ms. Fawcett married in Scotland in 1986. During their marriage they had two children: Melody (whose custody is not at issue here), in 1990, and Travis, in 1994. By 1998, their marriage was experiencing difficulties, and on November 20, 1998, a Scottish Sheriff Court issued a decree divorcing Mr. McRoberts and Ms. Fawcett. This divorce decree made a "Residence Order in respect of . . . TRAVIS COLIN PATRICK MCROBERTS . . . requiring that [he] live with" Mr. McRoberts, and a "Contact Order" that allowed Ms. Fawcett contact with Travis on weekends and other specified times, for two weeks during the summer, and one week during each of the October, Christmas, and Easter holidays.

Over the next two and a half years, Ms. Fawcett made more than fifty attempts to modify her contact order. The record reveals only two instances in which the Sheriff Court modified the order; in each case, it imposed *greater limitations* on Ms. Fawcett's contact rights. A February 11, 2000 order restricted Ms. Fawcett's visits with Travis to "every second Saturday between 10 a.m. and 5 p.m.," and required that the visits be supervised. A June 23, 2000 order created a four-week contact cycle granting Ms. Fawcett no contact in Week 1, "residential contact" on the weekend of Week 2, no contact in Week 3, and Saturday contact in Week 4.

2

In February 2001, Ms. Fawcett grew concerned that Mr. McRoberts might take Travis to the United States and sought an interdiction order from the Sheriff Court to prevent Mr. McRoberts from doing so. On February 15, the Sheriff Court "refuse[d] [the] same as Mr. McRoberts . . . gave an undertaking to the Court that he will not remove the aforementioned children from Scotland to the United States. . . ." The court then adjourned the hearing "for further evidence to be led."

Sometime shortly after this hearing, Mr. McRoberts and his second wife, Mrs. Tammy McRoberts, moved to the United States with Travis, and took efforts to conceal his whereabouts from Ms. Fawcett.

In an opinion issued March 29, 2001, the Sheriff Court, "on the Motion of [Ms. Fawcett] Sist[ed] the cause pending the outcome of a `Hague Convention' application to be made by [Mr. McRoberts]."[1] The court held that Mr. McRoberts

> (1) unlawfully and wrongfully removed [Travis] outwith the jurisdiction of this Court without the express permission of [Ms. Fawcett] in Contravention of her parental rights in terms of Section 2(3) and 2(6) of the Children Scotland Act 1995; (2) failed to attend the diets of this Court on 26 and 29 March 2001 without an acceptable excuse; (3) removed [Travis] from the jurisdiction of this Court by taking him to the United States of America in breach of a specific undertaking . . . not to do so pending determination of the present proceedings; and (4) Continues to retain [Travis] in the United States of America without disclosing his present whereabouts thereby depriving [Ms. Fawcett] of lawful contact with the said child.

The Sheriff Court then found Mr. McRoberts in contempt of court, fined him, and instructed the Sheriff Clerk to "take all necessary steps . . . to recover" the fine.

---

[1] *Webster's Third New International Dictionary* 2128 (1993) defines "Sist" as "1. *chiefly Scot*: to bring into court: SUMMON 2. *chiefly Scot*: a stay or suspension of legal proceedings; *also* : an order for a stay of proceedings."

On September 25, 2001, a lawyer acting for Ms. Fawcett filed a Petition for Return of Child and a Request for Emergency Ex Parte Hearing in the United States District Court for the Western District of Virginia. The court granted her request for an emergency *ex parte* hearing, which it held later that day. The court also held a hearing on that same day at which Mr. McRoberts was present and testified. In that proceeding, the court verbally ordered Mr. McRoberts not to remove Travis from the jurisdiction or seek any state court order. On October 2, 2001, the court held another hearing on Ms. Fawcett's petition, at which Mr. McRoberts again presented the only testimony.

On October 11, the district court granted Ms. Fawcett's petition and ordered that Travis be taken into custody by the Bedford County Department of Social Services and returned to the jurisdiction of the Sheriff Court in Ayr, Scotland. *Fawcett v. McRoberts*, 168 F. Supp. 2d 595 (W.D. Va. 2001). Mr. McRoberts complied with this order and Travis was returned to Scotland. The court also ordered Mr. McRoberts to pay costs and Ms. Fawcett's attorney's fees. Mr. McRoberts filed a timely appeal from both orders.

## II.

As a threshold matter, we must determine whether Mr. McRoberts's appeal is moot. We have "no authority`to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before'" us. *Church of Scientology v. United States*, 506 U.S. 9, 12 (1992) (quoting *Mills v. Green*, 159 U.S. 651, 653 (1895)). Though Ms. Fawcett does not contend that the case is moot, a court must resolve issues such as mootness, that concern its own jurisdiction, even when the parties do not raise such issues. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998); *Iron Arrow Honor Soc'y v. Heckler*, 464 U.S. 67, 70 (1983).

Of course, "compliance [with a trial court's order] does not [ordinarily] moot an appeal [of that order] if it remains possible to undo the effects of compliance or if the order will have a continuing impact on future action." 13A Charles A. Wright, et al., *Federal Practice & Procedure* § 3533.2 (2d ed. 1984); *see also Graddick v. Newman*, 453 U.S. 928, 937 (1981) (concluding that Court had the "power . . . to

4

enter an injunction ordering restoration of the prior status quo"); *id.* at 945 n.\* (Rehnquist, J., writing separately) ("[I]ssuance of a court's mandate or obedience to its judgment does not bar timely appellate review.") (citations omitted)). However, because in compliance with the district court's order in this case Travis has returned to Scotland, we must assure ourselves that a decision by this court can "affect the matter in issue." *Church of Scientology*, 506 U.S. at 12 (internal quotation marks and citation omitted). We believe that a decision favorable to Mr. McRoberts can clearly "affect the matter in issue" in this case.

Indeed, our recent opinion in *Miller v. Miller*, 240 F.3d 393 (4th Cir. 2001), is an implicit adoption of this view. In that case we considered the merits of an appeal from an order returning a child to Canada, even though the father had complied with the order, and the child was in Canada at the time of the appeal. *Id.* at 395, 404. Although we ultimately affirmed the district court's order, we could not have considered the merits of the appeal if the case had been rendered moot by the child's return to Canada pursuant to the district court's order. *See Steel Co.*, 523 U.S. at 94 (rejecting notion that courts may exercise "hypothetical jurisdiction").

The overwhelming majority of other courts have also evidenced their agreement with this position by routinely considering the merits of an appeal from an order returning a child to a foreign country, even when compliance with the order has resulted in the child's presence in a foreign country. *See, e.g.*, *Ohlander v. Larson*, 114 F.3d 1531, 1538-39 (10th Cir. 2000) (rejecting mother's arguments that her petition should be dismissed because it "was moot and because [the child] was no longer in Utah" and noting that accepting such arguments "could give parents an undue incentive to flee from Hague Convention proceedings"); *Janakakis-Kostun v. Janakakis*, 6 S.W.3d 843 (Ky. Ct. App. 1999) (reviewing merits of an appeal, even after child had been returned to Greece in compliance with trial court order made pursuant to Convention and ICARA); *see also, e.g.*, *Rydder v. Rydder*, 49 F.3d 369 (8th Cir. 1995) (reviewing merits of appeal from district court order that child be returned to foreign country pursuant to Convention and ICARA and in which no stay appears to have been issued); *Dalmasso v. Dalmasso*, 9 P.3d 551 (Kan. 2000) (same);

5

*Sampson v. Sampson*, 975 P.2d 1211 (Kan. 1999) (same); *Harkness v. Harkness*, 577 N.W.2d 116 (Mich. Ct. App. 1998) (same).

Indeed, at least two appellate courts have recently granted the precise relief Mr. McRoberts seeks, *i.e.*, reversal of a trial court's order returning a child to a foreign country even after the child has left the United States. *See In re Marriage of Jeffers*, 992 P.2d 686, 689, 692 (Co. Ct. App. 1999) (reversing "[t]he portion of the judgment returning the children to Greece" notwithstanding fact that children had already been returned to Greece in compliance with original order); *Bless v. Bless*, 723 A.2d 67, 75 (N.J. Super. Ct. 1998) (reversing and remanding to trial court, concluding "that jurisdiction has not been obliterated by [the child's] court-ordered presence in Switzerland"). Obviously these courts too concluded that their decision would "affect the matter in issue." *Church of Scientology*, 506 U.S. at 12 (internal quotation marks and citation omitted).

Notwithstanding this wealth of authority, and without acknowledging any of it, the Eleventh Circuit recently did dismiss as moot an appeal from a district court's order that a child be returned to a foreign country. *Bekier v. Bekier*, 248 F.3d 1051 (11th Cir. 2001). The district court had ruled that Ms. Bekier had wrongfully removed the child from his habitual residence in Israel. *Id.* at 1053. Ms. Bekier appealed, requesting that the court reverse the decision below or remand for further evidentiary hearings. *Id.* at 1054. While her appeal was pending, Mr. Bekier returned to Israel with their son. The Eleventh Circuit held Ms. Bekier's appeal moot because the return of the child to Israel left the court "powerless to grant the relief requested by Ms. Bekier." *Id.* at 1055; *cf. March v. Levine*, 136 F. Supp. 2d 831, 861 (M.D. Tenn.), *aff'd*, 249 F.3d 462 (6th Cir. 2001) (granting stay of order to return child, "[r]ecognizing that immediate return of the children to Mexico *may* effectively moot any appeal" (emphasis added)).

It is unclear why the *Bekier* court came to this conclusion. Although it cites several cases that purportedly support its mootness holding, all of those cases involve markedly different facts. For example, the *Bekier* court relied heavily on *B&B Chemical Co., Inc. v. United States EPA*, 806 F.2d 987, 989 (11th Cir. 1986), a case holding that a challenge to the execution of a warrant to enter property

6

was moot because the warrant had already been executed.[2] *B&B Chemical* was moot, however, because it would have been literally impossible to "un-enter" the property, even if the court had so ordered. The same logic applied to finding the university's appeal moot in *University of Texas v. Camenisch*, 451 U.S. 390, 398 (1981), where the university had complied with a court order to provide Camenisch with a sign-language interpreter, and Camenisch had graduated while the appeal was pending. Because the interpreter had already been provided, it would have been literally impossible for the court to un-provide the service (short of reversing time — a power that, perhaps regrettably, Congress has not yet granted the United States Courts of Appeals). As one court has noted, in some cases, like these, once an action has been taken "there is no way to unscramble the egg." *In re Ford*, 110 F.3d 954, 963 (3d Cir. 1997).

Such cases, however, present altogether different issues than the case at hand. Here, no law of physics would make it impossible for Ms. Fawcett to comply with an order by the district court that she return Travis to the United States. To the contrary, such orders are fully within the district court's power and are commonly issued by courts in the United States. *See, e.g.*, *Ohlander*, 114 F.3d at 1535; *Goldstein v. Goldstein*, 494 S.E.2d 745, 747 (Ga. Ct. App. 1998); *Hernandez v. Branciforte*, 770 N.E.2d 41, 45, 49 (Mass. Ct. App. 2002); *Roszkowski v. Roszkowska*, 644 A.2d 1150, 1160 (N.J. Super. Ct. 1993); *In re Vernor*, 94 S.W.3d 201, 206 (Tex. Ct. App. 2002); *Johnson v. Johnson*, 493 S.E.2d 668, 671 (Va. Ct. App. 1997); *see also, e.g.*, *Horlander v. Horlander*, 579 N.E.2d 91, 97 (Ind. Ct. App.

---

[2] The *Bekier* court also cited two unpublished opinions in which a case involving a petition under the Hague Convention was dismissed as moot. *See Bekier*, 248 F.3d at 1055 (citing *Brown v. Orange County Dep't of Soc. Serv.*, 1996 U.S. App. Lexis 15921 (9th Cir. July 1, 1996); *Mahmoud v. Mahmoud*, 1997 WL 43524 (E.D.N.Y. Jan. 29, 1997)). These cases, however, like *B&B Chemical*, have no bearing on the mootness of Mr. McRoberts's appeal. Though both cases involved children who had been removed from the United States, this was not the basis of the courts' mootness holding. Rather, both the appellant in *Brown v. Orange County*, and the petitioner in *Mahmoud*, already had physical custody of their children, and had thus received the primary relief they sought. Mr. McRoberts, however, has plainly not yet received the relief he now seeks.

1991) (concluding that court had jurisdiction to issue custody order even though child was in foreign country); *Ivaldi v. Ivaldi*, 685 A.2d 1319, 1326 (N.J. 1996) (same); *Middleton v. Middleton*, 314 S.E.2d 362, 367 (Va. 1984) (same).

One concern that may have prompted the *Bekier* court's decision is that while the remedy Ms. Bekier sought might not have been *impossible* to grant, as it was in *B&B Chemical*, the *Bekier* court may have believed that there would have been no mechanism for effectively *enforcing* an order that a child living outside the United States be returned to this country. *See Bekier*, 248 F.3d at 1054 ("Ms. Bekier's potential remedies now lie in the Israeli courts. Any words by us would be merely advisory.").

As an initial matter, it is not at all clear to us that a lack of effective methods for enforcing a court order necessarily means that the court's opinion "cannot affect the matter in issue," *Church of Scientology*, 506 U.S. at 12 (internal quotation marks and citation omitted), and therefore renders the case moot. In *Kadic v. Karadzic*, 70 F.3d 232 (2d Cir. 1995), for example, there was little hope that any court would be able to enforce a judgment against Radovan Karadzic, who was, at the time, the President of the self-proclaimed Bosnian-Serb republic "Srpska." *See* Jerry Adler, *Suing Bin Laden*, American Lawyer, Nov. 2001 at 30 (noting that even one of the plaintiffs' lawyers didn't "really expect the plaintiffs to collect anything from Karadzic, who is still a fugitive from the International War Crimes Tribunal at The Hague."). Nevertheless, the Second Circuit did not dismiss the plaintiffs' claims as moot, but rather after reversing the district court's holding that no jurisdiction existed, remanded to allow the case to proceed. *Kadic*, 70 F.3d at 236. Nor was enforcement regarded as a stumbling block in the cases cited above in which courts ordered a child returned to the United States from a foreign country. *See ante* at 7-8.

However, even if, hypothetically, the lack of an enforcement mechanism could leave a court completely unable to "affect the matter in issue," and render an appeal moot, Mr. McRoberts's appeal would still not be moot because he does have a mechanism for enforcing a judgment by this court or the district court on remand. The Child Abduction and Custody Act 1985, the United Kingdom's analogue to

8

ICARA, codifying the Hague Convention there, provides that "[a] decision to which [Articles 7 and 12 of the Hague Convention] appl[y] which was made in a Contracting State other than the United Kingdom shall be recognized in each part of the United Kingdom as if made by a court having jurisdiction to make it in that part." 1985, c. 60, Pt. II, § 15. Furthermore, that statute explicitly contemplates a revocation or variation of an order issued by a Contracting State and previously recognized by a court in the United Kingdom, and provides that in such circumstances the United Kingdom court shall either cancel its original order, § 17(2), or vary it, § 17(3). *See* c.60, Pt. II, § 17. Thus, Mr. McRoberts would be able to seek enforcement through the United Kingdom's courts of an order that Ms. Fawcett and Travis return to Virginia, were the district court, on remand, to issue such an order.

Although Mr. McRoberts could have proceeded directly to the United Kingdom's courts without seeking a reversal of the district court's order in the United States, there can nonetheless be no question that an order from the district court that Ms. Fawcett return to the United States with Travis would "affect the matter in issue in [this] case." *Church of Scientology*, 506 U.S. at 12 (internal quotation marks and citation omitted). Such an order would permit Mr. McRoberts to appear in the Scottish courts simply to seek enforcement of the United States judgment, rather than to re-argue the merits of any custody dispute respecting Travis (if, indeed, there even is a dispute over who has the right to custody of Travis).

Furthermore, even if the United Kingdom's courts did not recognize the order of a United States court, such an order could still "affect the matter in issue." *Id.* For example, Ms. Fawcett could comply with the court's order of her own volition. Or, if Ms. Fawcett failed to comply with the order, she could be held in contempt, and penalties could be assessed. *See, e.g.*, *Ohlander*, 114 F.3d at 1535; *Hernandez*, 770 N.E.2d at 49. Alternatively, it seems not too remote a possibility that Ms. Fawcett could at some point return to the United States with Travis, at which time Mr. McRoberts could seek to enforce such an order. *Cf. Michigan v. Doran*, 439 U.S. 282, 285 n.2 (1978) (rejecting argument that appeal from order granting writ of habeas corpus was moot because the prisoner had been released and could no longer be located (citation omitted)); *Eagles v. United States ex rel. Samuels*,

9

329 U.S. 304, 307-08 (1946) ("Though the writ has been granted and the prisoner released, the appellate court by what it does is not rendering an opinion and issuing an order which cannot affect the litigants in the case before it. Affirmance makes the prisoner's release final and unconditional. Reversal undoes what the habeas corpus court did and makes lawful a resumption of the custody." (citations omitted)).

In sum, it is clear that a decision reversing the district court's order in this case does not violate the prohibition against "opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." *Church of Scientology*, 506 U.S. at 12 (internal quotation marks and citation omitted). We therefore conclude that Mr. McRoberts's appeal is not moot, and turn now to the merits of that appeal.[3]

### III.

In an action under the Convention and ICARA, a petitioner must "establish, by a preponderance of the evidence, that her child[ ] w[as] `wrongfully removed or retained within the meaning of the Convention.'" *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (quoting 42 U.S.C. § 11603(e)(1)(A)). The Convention provides that:

> The removal or the retention of a child is to be considered wrongful where —
>
> [a]  it is in breach of rights of custody attributed to a person, an institution or any other body . . . under the law of the State in which the child was habitually resident, immediately before the removal or retention; and

---

[3] Even if Mr. McRoberts's appeal were otherwise moot, we would still have ancillary jurisdiction to consider his appeal based on the district court's order that Mr. McRoberts pay Ms. Fawcett's attorney's fees and costs. *See Arlington County Republican Comm. v. Arlington County*, 983 F.2d 587, 596 (4th Cir. 1994) (denying motion to dismiss appeal as moot because appellate court's determination of underlying action "may affect the amount of the attorneys' fees award").

[b]  at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Convention, art. 3.

In this case, the district court held that Mr. McRoberts wrongfully removed Travis from his habitual residence in Scotland, in breach of the "rights of custody," held by both Ms. Fawcett and the Sheriff Court. The court also held that both Ms. Fawcett and the Sheriff Court were actually exercising their custody rights at the time of Travis's removal. We address first Ms. Fawcett's asserted rights of custody, and then those of the Sheriff Court.

A.

The Convention provides that the removal of a child is wrongful if "it is in breach of rights of custody," Convention, art. 3(a), with "rights of custody . . . includ[ing] rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Convention, art. 5(a). The Convention also defines, by contrast, "rights of access," which "include the right to take a child for a limited period of time to a place other than the child's habitual residence." Convention, art. 5(b).

The district court correctly noted that Section 2 of the Children (Scotland) Act provides that a parent has the right, *inter alia*, "`to have the child living with him *or otherwise to regulate the child's residence*' and `if the child is not living with him, *to maintain personal relations and direct contact with the child on a regular basis*.'" *Fawcett*, 168 F. Supp. 2d at 601 (quoting Children (Scotland) Act §§ 2(1)(a), (c)) (emphasis added by district court). The court found that this statute gave Ms. Fawcett, as one of Travis' parents, the right to determine his residence, and thus, "rights of custody" as defined by the Convention.

The rights provided under § 2 of the Children (Scotland) Act, however, can be modified by court order or decree. Section 11 of that stat-

11

ute explicitly provides that a Sheriff Court may make "an order depriving a person of some or all of his parental responsibilities or parental rights in relation to a child." Children (Scotland) Act § 11(2)(a).[4]

In this case, the Sheriff Court did precisely that — the decree it issued divorcing Mr. McRoberts and Ms. Fawcett modified the parental rights that Ms. Fawcett would have otherwise had under § 2 of the Children (Scotland) Act. The "Residence Order" contained in the decree gives Mr. McRoberts the exclusive power to determine Travis's residence, thereby necessarily depriving Ms. Fawcett of that same right. Indeed, Ms. Fawcett's counsel conceded at oral argument that Ms. Fawcett had no right to determine Travis's residence within Scotland, and that that right rested exclusively with Mr. McRoberts.

As Sheriff David Kelbie noted in his commentary to the Scottish Court of Sessions's opinion in *Donofrio v. Burrell*, 2000 S.C.L.R. 465 at 16 (1999), a parent "clearly" loses "[her] 'rights of custody' [under the Convention] if the other parent is awarded a residence order." Thus, Ms. Fawcett's attorney admitted before the district court that "under the divorce decree and the subsequent interim orders, [Mr. McRoberts had] the notion of custody." *See also In re H (A Minor)*, 1999 WL 1319095, at *2 (House of Lords 1999) (noting without disapproval lower court's rejection of a parent's claim to "rights of custody" under Convention based on contact order and parent's failure to appeal the issue). Because the divorce decree of the Sheriff Court deprived Ms. Fawcett of her right to determine Travis's place of residence, the district court erred in holding that Ms. Fawcett had "rights of custody" as that term is used in the Convention.[5]

---

[4] Ms. Fawcett's similar argument that § 3 of the Children (Scotland) Act grants her affirmative rights as a mother, in addition to her rights as a parent under § 2, is subject to similar analysis (and rejection) because the rights under § 3, like those under § 2, can be modified by court orders made pursuant to § 11.

[5] The district court acknowledged that § 11 of the Children (Scotland) Act permitted a court to modify the parental rights provided under § 2. But after noting that "the contempt order [against Mr. McRoberts] stated that Travis's abduction was `in Contravention of her parental rights,'" the court found no "evidence that the sheriff court in Ayr has deprived Ms. Fawcett of her parental rights." *Fawcett*, 168 F. Supp. 2d at 602 n.11

12

While Ms. Fawcett has conceded that she had no right to determine Travis's residence within Scotland, she argues that § 2(3) of the Children (Scotland) Act gives her some rights to determine Travis's place of residence, and thereby confers upon her "rights of custody" under the Convention. Section 2(3) of the Children (Scotland) Act provides that, "[w]ithout prejudice to any court order, no person shall be entitled to remove a child habitually resident in Scotland from, or to retain any such child outwith, the United Kingdom without the consent of a person described in subsection (6) below." Subsection (6), in turn, applies subsection (3) to a person "who for the time being has and is exercising in relation to him" either the right "to have the child living with him or otherwise to regulate the child's residence" or "if the child is not living with him, to maintain personal relations and direct contact with the child on a regular basis." Children (Scotland) Act §§ 2(6), 2(3)(a) & (c). Assuming Ms. Fawcett was exercising the right to maintain personal relations and direct contact with Travis, § 2(3) does appear to prohibit Mr. McRoberts from removing Travis from the United Kingdom without Ms. Fawcett's consent. Indeed, Mr. McRoberts makes no argument to the contrary. What Mr. McRoberts does contest is Ms. Fawcett's assertion that the prohibition contained in § 2(3) conferred "rights of custody" upon her.

Two of our sister circuits have recently considered this question and agreed with Mr. McRoberts, rejecting arguments very similar to Ms. Fawcett's. Both *Gonzalez v. Gutierrez*, 311 F.3d 942 (9th Cir. 2002), and *Croll v. Croll*, 229 F.3d 133 (2d Cir. 2000), involved parents who brought a child to the United States in contravention of a *ne exeat* clause. Ms. Fawcett concedes that the substance of such clauses

---

(quoting Sheriff Court's contempt order). However, as explained above, the Sheriff Court's original divorce decree (not the later contact or contempt orders) deprived Ms. Fawcett of certain parental rights. Of course, the divorce decree also permitted Ms. Fawcett to retain other parental rights. Thus, while Travis's removal may have been "in contravention" of Ms. Fawcett's parental right to maintain contact with Travis, the removal was not "wrongful" within the terms of the Convention because the Sheriff Court had previously deprived Ms. Fawcett of the parental right to determine Travis's place of residence, and therefore she did not retain "rights of custody" of Travis under the Convention.

13

is indistinguishable from that of § 2(3) of the Children (Scotland) Act. Both the Second and Ninth Circuits held that a *ne exeat* clause does not confer "rights of custody" under the Convention upon a parent who otherwise holds only "rights of access." *Gonzalez*, 311 F.3d at 944; *see also Croll*, 229 F.3d at 135 (same). They reasoned that such clauses grant, "at most, a veto power." *Gonzalez*, 311 F.3d at 949; *see also Croll*, 229 F.3d at 140 (same). Thus, like § 2(3) of the Children (Scotland) Act, these clauses "serve[ ] only to allow a parent with access rights to impose a limitation on the custodial parent's right to expatriate his child. . . . [T]his hardly amounts to a right of custody." *Gonzalez*, 311 F.3d at 949. We find the reasoning of those courts persuasive and hold that § 2(3) of the Children (Scotland) Act does not confer "rights of custody" on Ms. Fawcett.

B.

The district court also found that "Travis was the subject of rights of custody "attributed to . . . an institution," namely, the Sheriff Court. *Fawcett*, 168 F. Supp. 2d at 603 (quoting Convention, art. 3). In so ruling, the district court misapprehended the nature of the proceedings pending in the Sheriff Court at the time Mr. McRoberts took Travis from Scotland, and therefore erred in its conclusion that the Sheriff Court was exercising "rights of custody" over Travis at the time of Travis's removal.

In reaching the conclusion that the Sheriff Court in Scotland was exercising "rights of custody" over Travis, the district court relied primarily on a case arising from a custody dispute in Ireland, *In re H*, 1999 WL 1319095. In *In re H*, a court initially awarded custody of the child to her mother, and gave only access rights to the child's father. Two years later, the father applied for guardianship, which under Irish law would have conferred upon him equal rights of custody. *Id.* at *4. *While the father's application for guardianship was pending*, the mother left Ireland with the child and the father petitioned under the Convention for return of the child. The House of Lords held that the Irish court "had rights of custody in respect of H. at the time of her removal and that these rights were being exercised *by reason of the pending application* of her father to be appointed her guardian." *Id.* (emphasis added).

14

Though we are obviously not bound by a decision from the House of Lords, judicial "opinions of our sister signatories" to the Convention are "entitled to considerable weight." *Air France v. Saks*, 470 U.S. 392, 404 (1985) (internal quotation marks and citation omitted). Thus, we will accept the holding of *In re H*, and assume, without deciding, that if an "application to the court . . . raise[s] matters of custody within the meaning of the Convention" the court may have "rights of custody," and further that a third party (such as a parent) may assert those rights in a petition for return of child. *In re H*, 1999 WL 1319095, at *3.

Even granting Ms. Fawcett the benefit of these assumptions, however, her argument fails because the application pending in the Sheriff Court *at the time* Mr. McRoberts left Scotland with Travis did not "raise matters of custody within the meaning of the Convention." *Id.* Indeed, Ms. Fawcett conceded at oral argument that she had not been seeking a residence order with respect to Travis at either the February 15 hearing, or in any other application pending before the Sheriff Court, but was rather seeking a court order prohibiting Mr. McRoberts from leaving Scotland.

Ms. Fawcett's application thus did not "raise matters of custody within the meaning of the Convention." *Id.* Even if the Sheriff Court had issued the order Ms. Fawcett had been seeking, the order would not have conferred any greater "rights of custody" on Ms. Fawcett than § 2(3) of the Children (Scotland) Act, or the *ne exeat* clauses discussed in *Gonzalez*, 311 F.3d at 944, and *Croll*, 229 F.3d at 135. *See ante* at 13-14. Therefore, the matter pending before the Sheriff Court did not "raise matters of custody within the meaning of the Convention," *In re H*, 1999 WL 1319095, at *3, and the Sheriff Court was not "actually exercis[ing]" any "rights of custody" over Travis at the time of his removal from Scotland. Convention, art. 3.

## IV.

In sum, the district court erred in holding that Ms. Fawcett or the Sheriff Court had "rights of custody" under the Convention.[6] Accord-

---

[6] In light of this holding, we must also hold the district court erred in awarding costs and attorney's fees to Ms. Fawcett.

15

ingly, we reverse and remand to the district court for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*

16