PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

ULRICH G. BADER,
            *Petitioner-Appellant,*

v.

SONJA KRAMER,
            *Respondent-Appellee.*

No. 05-1480

Appeal from the United States District Court
for the Eastern District of Virginia, at Alexandria.
Claude M. Hilton, District Judge.
(CA-04-375)

Argued: March 14, 2006

Decided: April 17, 2006

Before SHEDD and DUNCAN, Circuit Judges, and
James P. JONES, Chief United States District Judge
for the Western District of Virginia, sitting by designation.

Reversed and remanded by published opinion. Judge Shedd wrote the
opinion, in which Judge Duncan and Judge Jones joined.

## COUNSEL

**ARGUED:** Michael Alexander Johnson, ARNOLD & PORTER,
L.L.P., Washington, D.C., for Appellant. Laurence James Tracy, Falls
Church, Virginia, for Appellee. **ON BRIEF:** Thomas Holsten,
ARNOLD & PORTER, L.L.P., Washington, D.C., for Appellant.

**OPINION**

SHEDD, Circuit Judge:

Ulrich Bader filed a petition under the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601 *et seq.*, seeking the return of his daughter ("C.J.B.") to Germany. Bader alleged that his ex-wife, Sonja Kramer, violated the Hague Convention on Civil Aspects of Child Abduction ("Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 19 I.L.M. 1501, by taking C.J.B. to live in the United States. The district court concluded that Bader was not entitled to relief under the Hague Convention because he lacked sufficient custody rights. For the following reasons, we reverse and remand for further consideration.

I.

Bader is a citizen of Germany, and Kramer is a dual citizen of Germany and the United States.[1] Bader and Kramer were married in Germany in 1998. Their only child, C.J.B., was born in 1999 in Germany. From the date of C.J.B.'s birth until Kramer left Germany on April 4, 2003, Bader, Kramer, and C.J.B. all resided continuously in Germany.

In August 2000, Bader and Kramer separated. At all times after separation, C.J.B. resided with Kramer. Kramer was the sole source of financial support for C.J.B.

In November 2000, while employed as a foreman at a United States Army Munitions Depot, Bader was arrested for violations of the War Weapons Control Act and the Explosives Act. Bader was ultimately convicted of unauthorized transfer of the actual control of war weapons, unauthorized transportation of war weapons, and unauthorized handling of explosive substances. A German court sentenced him to a term of 42 months of incarceration and suspended his driving privileges.

---

[1]We present the facts as found by the district court in its opinion after trial.

During Bader's incarceration, C.J.B. continued to reside with Kramer and was supported by her. Bader received visits from C.J.B. accompanied by Kramer during the first six months of his incarceration.

Bader and Kramer were legally divorced in June 2002. C.J.B. continued to reside with Kramer and was supported financially by her subsequent to the divorce.

Bader was released from prison on December 17, 2002, and was placed on probation for a period of three years. That same day, Kramer and C.J.B. traveled to the United States with Bader's consent. They returned to Germany on January 3, 2003.

On January 9, 2003, Bader picked up C.J.B. from her school for an eight-day family ski vacation. On January 16, 2003, Kramer filed a petition in a German court seeking sole custody, and on February 6, 2003, Bader filed a petition seeking sole custody. On March 20, 2003, the German court ruled on the petitions, setting forth a visitation schedule for Bader and granting Kramer an award of child support in the amount of 177 euros per month.

On April 4, 2003, Kramer traveled to the United States with C.J.B. Kramer did not inform Bader of her intent to do so, and she did not have his consent. Kramer and C.J.B. have remained in the United States since that date.

In Germany, Bader filed a petition for sole custody in June 2003. In October 2003, Bader filed a Request for Return of Child under the Hague Convention with the Central Authority of Germany. The German Central Authority sent a letter to the American Central Authority in November 2003 stating that when Bader and Kramer "were divorced, no decision about the rights of custody was issued. So both still have parental responsibility for the child pursuant to Section 1626 of the German Civil Code (BGB)." J.A. 127-28. A German court granted him sole custody in an order dated December 4, 2003.

Bader then filed this petition in the district court under the Hague Convention. In a letter to Bader's counsel, Kramer stated that Bader

"was authorized visitation/custody rights (which he rarely exercised)." J.A. 161. Kramer stated in district court filings that the German court order "set conditions of visitation." J.A. 672. Additionally, at trial before the district court, Kramer admitted that when she left Germany with C.J.B. after the March 20, 2003, order she "shared joint custody over" C.J.B. with Bader and that she was "disappointed" with the provisions of the order. J.A. 905. The district court denied Bader any relief on his petition after finding that he did not have cognizable rights of custody under the Hague Convention. Bader now appeals.

## II.

The Hague Convention, a treaty to which the United States is a signatory party, is by its terms intended "to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and . . . to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Hague Convention art. 1. The Hague Convention provides a mandatory remedy of return that is meant both "to preserve the status quo" with respect to child custody and "to deter parents from crossing international boundaries in search of a more sympathetic court." *Miller v. Miller*, 240 F.3d 392, 398 (4th Cir. 2001) (internal quotations and citation omitted). The United States implemented the Convention's terms by statute in ICARA.

In order to secure the return of an abducted child, a petitioner must prove by a preponderance of the evidence that "the child has been wrongfully removed" within the meaning of the Hague Convention. 42 U.S.C. § 11603(e)(1). Under the Hague Convention, a petitioner can establish that removal of a child is "wrongful" where: (1) the child was "habitually resident" in the petitioner's country of residence at the time of removal, (2) the removal was in breach of the petitioner's custody rights under the law of his home state, and (3) the petitioner had been exercising those rights at the time of removal. *Humphrey v. Humphrey*, 434 F.3d 243, 246 (4th Cir. 2006). Additionally, the Hague Convention distinguishes between "rights of custody" — which are necessary to support a claim of wrongful removal — and mere "rights of access." *See Cantor v. Cohen*, ___ F.3d ___, 2006 Westlaw 700926, *4 (4th Cir. 2006) (stating that under the Hague Convention a petitioner "has no right to initiate judicial proceedings

for access claims"). Article 5(a) of the Hague Convention provides that "rights of custody" "shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Article 5(b) of the Hague Convention provides that "rights of access" "shall include the right to take a child for a limited period of time to a place other than the child's habitual residence."

Upon a showing of wrongful removal, return of the child is "required" unless the respondent establishes one of four defenses. *Miller*, 240 F.3d at 398. Two of the defenses must be supported by clear and convincing evidence: (1) that return would expose the child to a "grave risk" of "physical or psychological harm or otherwise place [the child] in an intolerable situation" and (2) that return of the child would not be permitted by "fundamental principles of the United States relating to the protection of human rights and fundamental freedoms." *Id.* (internal quotations omitted). The other two defenses may be supported by a preponderance of the evidence: (1) that the petition for return was not filed within one year of the removal and the child is now well-settled in another country, and (2) that the petitioner was not actually exercising his custodial rights at the time of the removal or had consented to or acquiesced in the removal. *Id.* at 399.

In an action under ICARA and the Hague Convention, we review the district court's findings of fact for clear error, while its conclusions regarding principles of domestic, foreign, and international law are reviewed *de novo*. *Miller*, 240 F.3d at 399.

III.

Bader contends that the district court erred in concluding that he no longer retained sufficient rights of custody in C.J.B. within the meaning of the Hague Convention. We agree.

The district court recognized — and the parties do not dispute — that German law presumptively confers, upon both parents, joint custody of the child until a competent court enters a contrary order. The district court then concluded that the March 20, 2003, order by the German court setting forth a visitation schedule "functioned to alter the presumption of joint custody." J.A. 995. We disagree.

In *Fawcett v. McRoberts*, 326 F.3d 491 (4th Cir. 2003), we addressed the similar question whether a Scottish court had issued an order modifying a parent's right to custody. We determined that a divorce decree in *Fawcett* did just that because it contained a "Residence Order." *Id.* at 499. Specifically, the "Residence Order" gave one parent "the exclusive power to determine [the child's] residence, thereby necessarily depriving [the other parent] of that same right." *Id.* Counsel even conceded that the petitioning parent had no right to determine the child's residence within Scotland and that the right rested exclusively with the other parent. *Id.* Additionally, we cited a Scottish case providing that a parent loses her "rights of custody" if the other parent is awarded a residence order. *Id.* Although Scottish law prohibited the abducting parent from removing the child from Scotland, *i.e.*, the equivalent of a *ne exeat* clause, we found that this Scottish law merely allowed "a parent with access rights to impose a limitation on the custodial parent's right to expatriate his child. . . . This hardly amounts to a right of custody." *Id.* at 500. Thus, not withstanding this ability to limit the expatriation of his child, the petitioning parent in *Fawcett* did not have "rights of custody" within the meaning of the Hague Convention because the divorce decree deprived one parent of her right to determine the child's place of residence. *Id.* at 499-500.

Here, the district court determined that Bader's visitation rights were inferior to the *ne exeat* rights that were insufficient to support the petition in *Fawcett*. Although the district court recognized that there was no explicit Residence Order as in *Fawcett*, it failed to recognize that Bader's rights of custody were never modified by the German court's March 20, 2003, order, which merely altered visitation rights. While the German court order delineated a schedule of visitation rights that clearly affect Bader's rights of access, it made absolutely no mention of modifying his rights to custody. The parties have not revealed any authority to suggest that rights of access and rights of custody are mutually exclusive, such that a modification of one eliminates the other. Indeed, the Eleventh Circuit has recognized a situation under the Hague Convention where a "French divorce decree awarded . . . visitation and lodging rights to the mother, and joint legal custody to both parents." *Bekier v. Bekier*, 248 F.3d 1051, 1052 (11th Cir. 2001). Thus, it is entirely possible for courts to modify the visitation rights of one parent without disturbing the underlying joint

custody of both parents. In the absence of any order removing Bader's ability to determine C.J.B.'s residence, he continued to retain joint custody over C.J.B.

The parties seemed to understand as much. It is undisputed that before the March 20, 2003, order both parents shared joint custody over C.J.B. Indeed, that order was a response to Kramer's petition for sole custody. Further, as we have catalogued above, Kramer has repeatedly acknowledged — both before and during trial — her understanding that after March 20, 2003, Bader retained rights of custody. Likewise, after March 20, 2003, the German Central Authority issued a letter stating that "both [parents] still have parental responsibility for the child" under the German Civil Code providing for joint custody. J.A. 127. Finally, the German court's subsequent award of sole custody to Bader in its order of December 4, 2003, suggests that Bader did retain some existing custodial rights over C.J.B. at the time of removal.

For these reasons, it is clear that Bader retained at least joint custody over C.J.B. because no competent German court has entered an order granting Kramer sole custody.[2] Thus, we remand the case to the district court for an expeditious determination of whether Bader was exercising those custody rights and whether any defenses apply under the Hague Convention.[3]

---

[2]In support of its conclusion that Bader did not have "cognizable custodial rights" under the Hague Convention, the district court further stated that Kramer was C.J.B.'s source for "pecuniary and emotional support" and discussed Bader's limited exercise of visitation rights. J.A. 997. This inquiry is irrelevant to whether a competent German court has issued an order contrary to the presumption of joint custody. While such a determination may be relevant to whether Bader has "exercised" his custody rights, the district court did not reach that inquiry.

[3]Although Bader urges us to entertain these issues, we believe it better to remand for the district court to consider them in the first instance. We are confident that the district court will decide these issues in an expeditious manner.

## IV.

Accordingly, we reverse the judgment of the district court and remand for further proceedings consistent with this opinion.

*REVERSED AND REMANDED*