IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

September 16, 2008

Charles R. Fulbruge III
Clerk

No. 07-50967

TIMOTHY MARK CAMERON ABBOTT,

Petitioner-Appellant,

v.

JACQUELYN VAYE ABBOTT,

Respondent-Appellee.

Appeal from the United States District Court
for the Western District of Texas, Austin Division
USDC No. 1:06-CV-359

Before KING, WIENER, and ELROD, Circuit Judges.

JENNIFER W. ELROD, Circuit Judge:

This case requires us to determine whether ne exeat rights constitute "rights of custody" within the meaning of the Hague Convention. For the reasons set forth below, we hold that they do not. We therefore affirm the district court's judgment.

I. FACTS AND PROCEEDINGS

Petitioner-Appellant Timothy Abbott is a British citizen, and Respondent-Appellee Jacquelyn Abbott is a U.S. citizen. The parties married in November 1992 in England, and their son was born in Hawaii in June 1995. Beginning in 2002, the parties and their minor son resided in La Serena, Chile. After the

parties separated in March 2003, they litigated in the Chilean family courts. The mother was awarded custody, and the father was granted visitation rights.

The Chilean courts entered four separate orders. The first, entered in January 2004, provided visitation rights to the father. The second, entered in November 2004, required the parties and their son to undergo private therapy, denied the father's request for custody rights, and granted all custodial rights to the mother. The third, entered in February 2005, expanded the father's visitation rights, including visitation for an entire month of summer vacation. On January 13, 2004, at the mother's request, the Chilean court entered a fourth order prohibiting the child's removal from Chile by either the father or the mother without their mutual consent (the "ne exeat order").[1]

In August 2005, the mother removed the child from Chile without the father's consent. She and the child departed without notice in the midst of disputes over visitation and other issues. Motions were pending before the Chilean family court at the time of the child's removal, but the Chilean court had previously awarded all custody rights to the mother in its November 2004 order. The father hired a private investigator and located his son in Texas. The father then filed suit in the United States District Court for the Western District of Texas and sought an order requiring that the child be returned to Chile pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the "Hague Convention"), Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 49.[2]

---

[1] "Ne exeat" is defined in the family law context as "[a]n equitable writ restraining a person from leaving, or removing a child or property from, the jurisdiction." BLACK'S LAW DICTIONARY 1060 (8th ed. 2004).

[2] Although the father initially pursued only temporary enforcement of his Chilean visitation rights, the subsequent complaint asserting his rights under the Hague Convention was filed within the one-year statute of limitations.

The district court held a bench trial in February 2007. The mother conceded that she had violated both the Chilean family court's ne exeat order and a Chilean statute that required the father's authorization before the child could leave Chile. The father argued that the ne exeat order and the statutory ne exeat provision gave him "rights of custody" within the meaning of the Hague Convention.[3] The district court denied return of the child, finding that the child's removal from Chile did not constitute a breach of the father's "rights of custody" as defined by the Hague Convention.

## II. STANDARD OF REVIEW

We review a district court's interpretation of a treaty de novo. United States v. Jimenez-Nava, 243 F.3d 192, 195 (5th Cir. 2001).

## III. DISCUSSION

### A. The Hague Convention

The objects of the Hague Convention are (a) to secure the prompt return of children removed from one party country to another in violation of the Convention's terms; and (b) to ensure that rights of custody and rights of access under the law of one party country are respected in the others. See Hague Convention art. I. Eighty countries are parties to the Hague Convention, which has been in force between the United States and the Republic of Chile at all times relevant to this case. The Hague Convention is implemented by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11611 (1988), in the United States. The ICARA requires that in any action brought under the Hague Convention for the return of a child, the

---

[3] The father also argued that Article 229 of the Chilean Civil Code afforded him certain "residual custodial rights," but the district court correctly concluded that the statute clearly provides only for "access" or visitation rights (the right to "maintain a direct and regular relationship with the child"), not custody rights. See Villegas Duran v. Arribada Beaumont, No. 06-5614, 2008 U.S. App. LEXIS 15299, at *13–14 (2d Cir. July 18, 2008, amended July 22, 2008) (holding in Hague Convention case that Article 229 of the Chilean Civil Code addresses only visitation rights, not custody rights).

petitioner prove by a preponderance of the evidence that the child in question "has been wrongfully removed or retained within the meaning of the Convention." Id. at § 11603(e)(1)(A).

Article 3 of the Hague Convention provides as follows:

The removal or the retention of a child is to be considered wrongful where --

a) it is in breach of rights of custody attributed to a person . . . , either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

The rights of custody mentioned in sub-paragraph (a) above, may arise in particular by operation of law or by reason of a judicial or administrative decision, or by reason of an agreement having legal effect under the law of that State.

Hague Convention art. III (emphasis added). Thus, the Hague Convention provides the remedy of return of a child only if the child's removal from the country breached "rights of custody attributed to a person." Id. The Hague Convention specifically distinguishes between "rights of custody" and "rights of access":

a) "rights of custody" shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;

b) "rights of access" shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.

Hague Convention art. V. The remedy of return is available only for a violation of "rights of custody" under the Hague Convention, and that term is defined to include, "in particular, the right to determine the child's place of residence." Id.

The dispositive question in the present case is whether the father possessed "rights of custody" as defined by the Hague Convention.

B. Statutory Rights under Chilean Law

A Chilean statute concerning the departure of minors from Chile provides that if a non-custodial parent has visitation rights, that parent's authorization is required before the custodial parent can take the child out of the country (although a custodial parent may apply to the court for permission to remove the child for an authorized period of time).[4] The mother conceded that she violated the ne exeat order by unilaterally removing the parties' son. The district court correctly found that the Chilean statute "does not confer rights distinguishable in any significant way from those conferred by the Chilean court's ne exeat order." Abbott v. Abbott, 495 F. Supp. 2d 635, 638 n.3 (W.D. Tex. 2007). Therefore, in this analysis, any rights accruing to the father under the ne exeat order will be treated the same as rights accruing under the statutory ne exeat provision.

---

[4] The Chilean statute concerning the departure of minors from Chile, according to the father's expert witness, provides in relevant part:

> If the judge has entrusted custody to one of the parents or to a third party, the legitimate child may not leave except under authorization of the person to whom he has been entrusted.
>
> Once the court has decreed the obligation to allow visits pursuant to the preceding article, authorization of the father or mother who has the right to visit a child shall also be required . . . .
>
> If the authorization cannot be granted or is denied without good reason by one of those who must give it by virtue of this article, it may be granted by the Family Court Judge in the location where the minor resides.

MINORS LAW 16,618 OF CHILE art. 49 (emphasis added).

C.     The Circuit Split

Three federal appellate courts have determined that ne exeat orders and statutory ne exeat provisions do not create "rights of custody" under the Hague Convention.   See Fawcett v. McRoberts, 326 F.3d 491, 500 (4th Cir. 2003); Gonzalez v. Gutierrez, 311 F.3d 942, 948 (9th Cir. 2002); Croll v. Croll, 229 F.3d 133, 138–39 (2d Cir. 2000).   One federal appellate court, however, has reached the opposite conclusion.[5]   See Furnes v. Reeves, 362 F.3d 702, 719 (11th Cir. 2004).   The issue is one of first impression in the Fifth Circuit.

1.     Second Circuit Opinion in Croll

In Croll, the custodial mother removed the parties' child from Hong Kong without the consent of the child's father in violation of a Hong Kong court's custody order.   The Second Circuit considered whether a ne exeat clause in the custody order coupled with rights of access (visitation) conferred "rights of custody" within the meaning of the Hague Convention.   229 F.3d at 135. Recognizing that it was the first federal appellate court to consider the issue, the Second Circuit engaged in an exhaustive analysis of the purpose and design of the Hague Convention, its wording, the intent of its drafters and the case law of other signatory states.   Id. at 137.   The Croll court considered the ordinary meaning of the phrase "rights of custody" and determined that the Hague Convention referred to a bundle of rights relating to custody, such that

---

[5] Other federal appellate courts have referenced Croll without reaching the present issue of whether ne exeat rights are "rights of custody" under the Hague Convention. *See, e.g.*, *Vale v. Avila*, No. 08-2161, 2008 U.S. App. LEXIS 17068, at \*12–13 (7th Cir. July 17, 2008) (holding that the court "need not decide whether the doctrine of ne exeat creates custody rights" because the petitioner had the right of patria potestas under Venezuelan law, and "[w]hen the parent who does not receive physical custody is given the rights and duties of patria potestas, he has custody rights within the meaning of the Hague Convention"); *Whallon v. Lynn*, 230 F.3d 450, 458 n.9, 459 (1st Cir. 2000) (distinguishing Croll and holding that patria potestas rights constitute an "affirmative grant of custody rights to [the petitioner] under Mexican law" and are "rights of custody" under the Hague Convention).

possessing only one of the rights did not amount to having "rights of custody." Id. at 138–39.

The Second Circuit's analysis is consistent with the emphasis the Hague Convention places on "the right to determine the child's place of residence" because a ne exeat veto right is only a partial power—in other words, only one of a bundle of residence-determining rights. The Croll court stated that this "single veto power, even if leveraged, falls short of conferring a joint right to determine the child's residence, particularly since an earlier clause in the custody order awards 'custody[,] care and control' solely to the mother." Id. at 139–40. The mother had the right to choose where the child would live within Hong Kong, and the father had no control over her choice. Furthermore, although the father could refuse to consent to the child's removal from Hong Kong, he could not require that the child live in another country; thus, he had only a veto right over the child's removal from Hong Kong rather than an affirmative right to determine the child's residence.

While recognizing that the mother's violation of the Hong Kong order had frustrated the father's visitation rights, the Second Circuit refused to judicially amend the Hague Convention's "explicit textual distinction between rights of custody and rights of access." Id. at 142. The court held that the Hague Convention's remedy of return is available only if rights of custody are violated, explaining that "the frustration of judicial power is not the touchstone for a return remedy under the Convention." Id. The Fourth and Ninth Circuits have followed Croll, holding that ne exeat rights are not "rights of custody" under the Hague Convention. See Fawcett, 326 F.3d at 500; Gonzalez, 311 F.3d at 948.

2. Eleventh Circuit Opinion in Furnes

The Eleventh Circuit has explicitly rejected Croll. Furnes, 362 F.3d at 719. In Furnes, a provision in the Norwegian Children Act contained a ne exeat clause providing that "[i]f the parents have joint parental responsibility, both of

them must consent to the child moving abroad." Id. at 707–08. Norwegian law granted parents with visitation rights "joint parental responsibility," which meant in this case that the non-custodial father[6] had the right "to make decisions for the child in personal matters," including "decisions that affect the child's care." Id. at 706, 714. Norwegian law also provided, however, that because the child lived with her mother, the mother had the right to determine "where in Norway the child shall live." Id. at 708.

The Furnes court determined that the custodial mother (who could determine where the child lived within Norway) and the non-custodial father (who could veto the child's removal from Norway) "each possessed elements of [the] place-of-residence right, which they exercised jointly." Id. at 719–20. The Eleventh Circuit then held that a ne exeat right alone is sufficient[7] to constitute a custody right: "We conclude that this ne exeat right grants [the father] a right of custody under the Hague Convention." Id. at 714. The court explained,

> [E]ven if [the father's] ne exeat right is (we believe incorrectly) viewed as a mere "veto right" or limitation on [the mother's] right to determine [the child's] place of residence, we nevertheless believe that the ne exeat right under Norwegian law is a right of custody under the Convention . . . . [E]ven assuming arguendo that [the

---

[6] The Eleventh Circuit explained that a court in Norway had granted custody of the child to the father and had found that the mother instigated conflict and had made false accusations against the father. Furnes, 362 F.3d at 704. The mother appealed the court's custody decision, and the parties reached an agreement while the appeal was still pending. Id. at 706. The parties agreed that they would maintain "joint parental responsibility" for their daughter according to Norwegian law; that the child would live with her mother, who would have custody; and that the father would have certain rights of access. Id. The Furnes opinion was based on the ne exeat clause and on the custody arrangements set out in the parties' agreement, with Norwegian law defining the term "joint parental responsibility."

[7] Another part of the Furnes opinion, however, refers to "rights of custody" as derived from a ne exeat right in combination with rights of "joint parental responsibility." 362 F.3d at 720 ("We conclude that this ne exeat right, especially in the context of [the father's] retained rights under §30 [giving those with parental responsibility 'the right and duty to make decisions for the child in personal matters'], constitutes a 'right of custody' as defined in the Convention.").

father] does not have the right to determine [the child's] place of residence, he has at the very least a veto right relating to the determination of her place of residence—that is, a right "relating to the care of the person" of [the child]. As such, the ne exeat right . . . provides [the father] with a right of custody over [the child] as defined by the Hague Convention.

Id. at 716. The Furnes court reversed the district court's denial of the father's petition and remanded for entry of an order that the child be returned to Norway.

### 3. Decisions from Other Countries

As the district court noted, foreign courts disagree regarding whether ne exeat rights are "rights of custody" within the meaning of the Hague Convention:

The opinions of courts in other signatory states to the Hague Convention are also "entitled to considerable weight." Air France v. Saks, 470 U.S. 392, 404 (1985). As outlined in Gonzalez and Croll, however, the cases from other signatory states addressing the rights conferred on a parent by a ne exeat order are "few, scattered, [and] conflicting" and thus do not guide this Court in its consideration of the issue.

Abbott, 495 F. Supp. 2d at 638 n.4. The Furnes court catalogued the foreign opinions on the issue, noting that courts in the United Kingdom, Australia, South Africa, and Israel have held that ne exeat rights do constitute "rights of custody" under the Hague Convention, while Canadian and French courts have reached the opposite conclusion. Furnes, 362 F.3d at 717–18.

### D. The District Court's Decision

The district court held a bench trial on February 16, 2007, allowing each side one hour for presentation. It appears that only the father testified at trial, and the facts were essentially undisputed. The mother's attorney conceded that the mother had violated both the Chilean family court's ne exeat order and a Chilean statute that required the father's authorization before the child could

leave Chile. The mother argued, however, that the father did not have "rights of custody" within the meaning of the Hague Convention.

In its Findings of Fact and Conclusions of Law, the district court correctly identified the issue as whether the removal was "wrongful" under the Hague Convention, which hinged on whether the father possessed "rights of custody." The district court then factually distinguished Furnes, 362 F.3d 702, noting that the father in Furnes had rights of "joint parental responsibility" while the father in the instant case did not have "Chilean statutorily protected rights to make decisions affecting" his son's care. Abbott, 495 F. Supp. 2d at 639. The district court then followed Croll, Gonzalez, and Fawcett, holding that the ne exeat order did not give the father "rights of custody" but gave him only "veto power over specific places of residence" that the mother might select. Id. at 640. The district court noted that entry of the ne exeat order did not give the father custody rights or change the mother's daily control over the child. Id.

The district court focused on the Hague Convention's distinction between "rights of access" and "rights of custody" and quoted from the official history and commentary on the Hague Convention (which had also been quoted in Croll and in Gonzalez), confirming that despite a discussion on the issue, there was no agreement by the Hague Convention drafters to establish a remedy of return for violation of "rights of access." Id.[8] The district court concluded:

> Although Ms. Abbott's removal of [the parties' son] violated and frustrated the Chilean court's order, so too would the removal of a child from a country in which any parent with rights of access resided. Mr. Abbott's right of access, however enhanced and protected by the ne exeat order, is simply not sufficient to create rights of custody that warrant the greater protection intended under the Hague Convention. This Court in no way condones Ms. Abbott's

---

[8] We need not, and do not, rely on this analogue of legislative history, as the Hague Convention's "explicit textual distinction between rights of custody and rights of access" compels our decision. See Croll, 229 F.3d at 142.

action. . . . [The child's] residence in the United States obviously interferes with Mr. Abbott's visitation rights, as established by the Chilean court. However, the Hague Convention explicitly creates a different set of remedies for those parents whose rights of access are frustrated by the custodial parent's removal of a child . . . .

Id. at 640–41 (citation and footnotes omitted). The district court denied return of the child, finding that the father did not establish by a preponderance of the evidence that his son's removal constituted a breach of "rights of custody" as defined by the Hague Convention.

We note that the ne exeat order prohibited either parent from removing the child from Chile without the consent of the other. The ne exeat order thus gave the father a veto right over his son's departure from Chile, but it did not give him any rights to determine where in Chile his child would live. Furthermore, the Chilean family court, in its second order, expressly denied the father's request for custody rights and awarded all custody rights to the mother.

We find persuasive Croll's reasoning that the Hague Convention clearly distinguishes between "rights of custody" and "rights of access" and that ordering the return of a child in the absence of "rights of custody" in an effort to serve the overarching purposes of the Hague Convention would be an impermissible judicial amendment of the Convention. We hold that ne exeat rights, even when coupled with "rights of access," do not constitute "rights of custody" within the meaning of the Hague Convention. The Hague Convention provides a remedy of return only for a parent who holds "rights of custody." The father in this case did not hold such rights.

## IV. CONCLUSION

Although Jacquelyn Abbott unquestionably violated Mark Abbott's rights by removing their child from Chile without his consent, he possessed only rights of access to the child, and not rights of custody, at the time of the child's removal.

Under these circumstances, the Hague Convention does not provide a remedy of return of the child to Chile.  We therefore AFFIRM the district court's judgment.