(Slip Opinion) OCTOBER TERM, 2009 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## ABBOTT *v.* ABBOTT

### CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

No. 08–645.   Argued January 12, 2010—Decided May 17, 2010

After the Abbotts, a married couple, moved to Chile and separated, the Chilean courts granted respondent wife daily care and control of their minor son, A. J. A., while awarding petitioner husband visitation rights.  Mr. Abbott also had a *ne exeat* right to consent before Ms. Abbott could take A. J. A. out of the country under Chile Minors Law 16,618 (Minors Law 16,618), art. 49.   When Ms. Abbott brought A. J. A. to Texas without permission from Mr. Abbott or the Chilean family court, Mr. Abbott filed this suit in the Federal District Court, seeking an order requiring his son's return to Chile under the Hague Convention on the Civil Aspects of International Child Abduction (Convention) and the implementing statute, the International Child Abduction Remedies Act (ICARA), 42 U. S. C. §11601 *et seq.*   Among its provisions, the Convention seeks "to secure the prompt return of children wrongfully removed or retained in any Contracting State," Art. 1; provides that such "removal or retention . . . is to be considered wrongful where" "it is in breach of rights of custody attributed to a person . . . under the law of the State in which the child was [theretofore] habitually resident," Art. 3*(a),* and where "those rights [had] been] actually exercised . . . or would have been so exercised but for the removal or retention," Art. 3*(b);* and defines "rights of custody" to "include . . . the right to determine the child's place of residence," Art. 5*(a).*   The District Court denied relief, holding that the father's *ne exeat* right did not constitute a "righ[t] of custody" under the Convention and, thus, that the return remedy was not authorized.  The Fifth Circuit affirmed.

*Held:* A parent has a right of custody under the Convention by reason of that parent's *ne exeat* right.  Pp. 4–17.

   (a) The Convention applies because A. J. A. is under 16; he was a

habitual resident of Chile; and both Chile and the United States are contracting states. The ICARA instructs the state or federal court in which a petition alleging international child abduction has been filed to "decide the case in accordance with the Convention." §§11603(b), (d). P. 5.

(b) That A. J. A. was wrongfully removed from Chile in violation of a "righ[t] of custody" is shown by the Convention's text, by the U. S. State Department's views, by contracting states' court decisions, and by the Convention's purposes. Pp. 5–18.

(1) Chilean law determines the content of Mr. Abbott's right, while the Convention's text and structure resolve whether that right is a "righ[t] of custody." Minors Law 16,618, art. 49, provides that "[o]nce the court has decreed" that one of the parents has visitation rights, that parent's "authorization" generally "shall also be required" before the child may be taken out of the country. Because Mr. Abbott has direct and regular visitation rights, it follows that he has a *ne exeat* right under article 49. The Convention recognizes that custody rights can be decreed jointly or alone, see Art. 3*(a),* and Mr. Abbott's *ne exeat* right is best classified as a "joint right of custody," which the Convention defines to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence," Art. 5*(a).* Mr. Abbott's right to decide A. J. A.'s country of residence allows him to "determine the child's place of residence," especially given the Convention's purpose to prevent wrongful removal across international borders. It also gives him "rights relating to the care of the person of the child," in that choosing A. J. A.'s residence country can determine the shape of his early and adolescent years and his language, identity, and culture and traditions. That a *ne exeat* right does not fit within traditional physical-custody notions is beside the point because the Convention's definition of "rights of custody" controls. This uniform, text-based approach ensures international consistency in interpreting the Convention, foreclosing courts from relying on local usage to undermine recognition of custodial arrangements in other countries and under other legal traditions. In any case, this country has adopted modern conceptions of custody *e.g.,* joint legal custody, that accord with the Convention's broad definition. Ms. Abbott mistakenly claims that a *ne exeat* right cannot qualify as a right of custody because the Convention requires that any such right be capable of "exercis[e]." When one parent removes a child without seeking the *ne exeat* holder's consent, it is an instance where the right would have been "exercised but for the removal or retention," Art. 3*(b).* The Fifth Circuit's conclusion that a breach of a *ne exeat* right does not give rise to a return remedy would render the Convention meaningless in many cases where it is

most needed. Any suggestion that a *ne exeat* right is a right of access is atexual, as a *ne exeat* right is not even arguably a "right to take a child for a limited period of time." Art. 5*(b)*. Ms. Abbott's argument that the *ne exeat* order in this case cannot create a right of custody is not dispositive because Mr. Abbott asserts rights under Minors Law 16,618, which do not derive from the order. Pp. 6–11.

(2) This Court's conclusion is strongly supported and informed by the longstanding view of the State Department's Office of Children's Issues, this country's Convention enforcement entity, that *ne exeat* rights are rights of custody. The Court owes deference to the Executive Branch's treaty interpretations. See *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 185. There is no reason to doubt this well-established canon here. The Executive, when dealing with delicate foreign relations matters like international child abductions, possesses a great store of information on practical realities such as the reactions from treaty partners to a particular treaty interpretation and the impact that interpretation may have on the State Department's ability to reclaim children abducted from this country. Pp. 11–12.

(3) The Court's view is also substantially informed by the views of sister contracting states on the issue, see *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng,* 525 U. S. 155, 176, particularly because the ICARA directs that "uniform international interpretation" of the Convention is part of its framework, see §11601(b)(3)(B). While the Supreme Court of Canada has reached an arguably contrary view, and French courts are divided, a review of the international law confirms that courts and other legal authorities in England, Israel, Austria, South Africa, Germany, Australia, and Scotland have accepted the rule that *ne exeat* rights are rights of custody within the Convention's meaning. Scholars agree that there is an emerging international consensus on the matter. And the Convention's history is fully consistent with the conclusion that *ne exeat* rights are just one of the many ways in which custody of children can be exercised. Pp. 12–16.

(4) The Court's holding also accords with the Convention's objects and purposes. There is no reason to doubt the ability of other contracting states to carry out their duty to make decisions in the best interests of the children. To interpret the Convention to permit an abducting parent to avoid a return remedy, even when the other parent holds a *ne exeat* right, runs counter to the Convention's purpose of deterring child abductions to a country that provides a friendlier forum. Denying such a remedy would legitimize the very action, removal of the child, that the Convention was designed to prevent, while requiring return of the child in cases like this one helps deter abductions and respects the Convention's purpose to prevent harms

to the child resulting from abductions.  Pp. 16–18.

   (c) While a parent possessing a *ne exeat* right has a right of custody and may seek a return remedy, return will not automatically be ordered if the abducting parent can establish the applicability of a Convention exception, such as "a grave risk that . . . return would expose the child to . . . harm or [an] otherwise . . . intolerable situation," or the objection to removal by a child who has reached a sufficient "age and degree of maturity" to state a preference, Art. 13*(b)*.  The proper interpretation and application of exceptions may be addressed on remand.  P. 18.

542 F. 3d 1081, reversed and remanded.

   KENNEDY, J., delivered the opinion of the Court, in which ROBERTS, C. J., and SCALIA, GINSBURG, ALITO, and SOTOMAYOR, JJ., joined.  STEVENS, J., filed a dissenting opinion, in which THOMAS and BREYER, JJ., joined.

NOTICE: This opinion is subject to formal revision before publication in the preliminary print of the United States Reports. Readers are requested to notify the Reporter of Decisions, Supreme Court of the United States, Washington, D. C. 20543, of any typographical or other formal errors, in order that corrections may be made before the preliminary print goes to press.

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–645

———————

## TIMOTHY MARK CAMERON ABBOTT, PETITIONER *v.* JACQUELYN VAYE ABBOTT

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 17, 2010]

JUSTICE KENNEDY delivered the opinion of the Court.

This case presents, as it has from its inception in the United States District Court, a question of interpretation under the Hague Convention on the Civil Aspects of International Child Abduction (Convention), Oct. 24, 1980, T. I. A. S. No. 11670, S. Treaty Doc. No. 99–11. The United States is a contracting state to the Convention; and Congress has implemented its provisions through the International Child Abduction Remedies Act (ICARA), 102 Stat. 437, 42 U. S. C. §11601 *et seq.* The Convention provides that a child abducted in violation of "rights of custody" must be returned to the child's country of habitual residence, unless certain exceptions apply. Art. 1, S. Treaty Doc. No. 99–11, at 7 (Treaty Doc.). The question is whether a parent has a "righ[t] of custody" by reason of that parent's *ne exeat* right: the authority to consent before the other parent may take the child to another country.

I

Timothy Abbott and Jacquelyn Vaye Abbott married in England in 1992. He is a British citizen, and she is a citizen of the United States. Mr. Abbott's astronomy

profession took the couple to Hawaii, where their son
A. J. A. was born in 1995.  The Abbotts moved to La
Serena, Chile, in 2002.  There was marital discord, and
the parents separated in March 2003.  The Chilean courts
granted the mother daily care and control of the child,
while awarding the father "direct and regular" visitation
rights, including visitation every other weekend and for
the whole month of February each year.  App. 9.

Chilean law conferred upon Mr. Abbott what is com-
monly known as a *ne exeat* right: a right to consent before
Ms. Abbott could take A. J. A. out of Chile.  See Minors
Law 16,618, art. 49 (Chile), App. to Pet. for Cert. 61a
(granting a *ne exeat* right to any parent with visitation
rights).  In effect a *ne exeat* right imposes a duty on one
parent that is a right in the other.  After Mr. Abbott ob-
tained a British passport for A. J. A., Ms. Abbott grew
concerned that Mr. Abbott would take the boy to Britain.
She sought and obtained a "*ne exeat* of the minor" order
from the Chilean family court, prohibiting the boy from
being taken out of Chile.

In August 2005, while proceedings before the Chilean
court were pending, the mother removed the boy from
Chile without permission from either the father or the
court.  A private investigator located the mother and the
child in Texas.  In February 2006, the mother filed for
divorce in Texas state court.  Part of the relief she sought
was a modification of the father's rights, including full
power in her to determine the boy's place of residence and
an order limiting the father to supervised visitation in
Texas. This litigation remains pending.

Mr. Abbott brought an action in Texas state court,
asking for visitation rights and an order requiring Ms.
Abbott to show cause why the court should not allow Mr.
Abbott to return to Chile with A. J. A.  In February 2006,
the court denied Mr. Abbott's requested relief but granted
him "liberal periods of possession" of A. J. A. throughout

February 2006, provided Mr. Abbott remained in Texas. App. 42.

In May 2006, Mr. Abbott filed the instant action in the United States District Court for the Western District of Texas. He sought an order requiring his son's return to Chile pursuant to the Convention and enforcement provisions of the ICARA. In July 2007, after holding a bench trial during which only Mr. Abbott testified, the District Court denied relief. The court held that the father's *ne exeat* right did not constitute a right of custody under the Convention and, as a result, that the return remedy was not authorized. 495 F. Supp. 2d 635, 640.

The United States Court of Appeals for the Fifth Circuit affirmed on the same rationale. The court held the father possessed no rights of custody under the Convention because his *ne exeat* right was only "a veto right over his son's departure from Chile." 542 F. 3d 1081, 1087 (2008). The court expressed substantial agreement with the Court of Appeals for the Second Circuit in *Croll* v. *Croll*, 229 F. 3d 133 (2000). Relying on American dictionary definitions of "custody" and noting that *ne exeat* rights cannot be "'actually exercised'" within the meaning of the Convention, *Croll* held that *ne exeat* rights are not rights of custody. *Id.,* at 138–141 (quoting Art. 3*(b)*, Treaty Doc., at 7). A dissenting opinion in *Croll* was filed by then-Judge Sotomayor. The dissent maintained that a *ne exeat* right is a right of custody because it "provides a parent with decisionmaking authority regarding a child's international relocation." 229 F. 3d, at 146.

The Courts of Appeals for the Fourth and Ninth Circuits adopted the conclusion of the *Croll* majority. See *Fawcett* v. *McRoberts*, 326 F. 3d 491, 500 (CA4 2003); *Gonzalez* v. *Gutierrez*, 311 F. 3d 942, 949 (CA9 2002). The Court of Appeals for the Eleventh Circuit has followed the reasoning of the *Croll* dissent. *Furnes* v. *Reeves*, 362 F. 3d 702, 720, n. 15 (2004). Certiorari was granted to resolve the

conflict. 557 U. S. ___ (2009).

## II

The Convention was adopted in 1980 in response to the problem of international child abductions during domestic disputes. The Convention seeks "to secure the prompt return of children wrongfully removed to or retained in any Contracting State," and "to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." Art. 1, Treaty Doc., at 7.

The provisions of the Convention of most relevance at the outset of this discussion are as follows:

> "Article 3: The removal or the retention of the child is to be considered wrongful where—
>
> "*a* it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the re-moval or retention; and
> "*b* at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.
>
> .     .     .     .     .
>
> "Article 5: For the purposes of this Convention—
>
> "*a* 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
> "*b* 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence.
>
> .     .     .     .     .
>
> "Article 12: Where a child has been wrongfully re-

moved or retained in terms of Article 3 . . . the authority concerned shall order the return of the child forthwith." *Id.,* at 7, 9.

The Convention's central operating feature is the return remedy. When a child under the age of 16 has been wrongfully removed or retained, the country to which the child has been brought must "order the return of the child forthwith," unless certain exceptions apply. See, *e.g.,* Arts. 4, 12, *ibid.* A removal is "wrongful" where the child was removed in violation of "rights of custody." The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Art. 5*(a)*, *id.,* at 7. A return remedy does not alter the pre-abduction allocation of custody rights but leaves custodial decisions to the courts of the country of habitual residence. Art. 19, *id.,* at 11. The Convention also recognizes "rights of access," but offers no return remedy for a breach of those rights. Arts. 5*(b)*, 21, *id.,* at 7, 11.

The United States has implemented the Convention through the ICARA. The statute authorizes a person who seeks a child's return to file a petition in state or federal court and instructs that the court "shall decide the case in accordance with the Convention." 42 U. S. C. §§11603(a), (b), (d). If the child in question has been "wrongfully removed or retained within the meaning of the Convention," the child shall be "promptly returned," unless an exception is applicable. §11601(a)(4).

## III

As the parties agree, the Convention applies to this dispute. A. J. A. is under 16 years old; he was a habitual resident of Chile; and both Chile and the United States are contracting states. The question is whether A. J. A. was "wrongfully removed" from Chile, in other words, whether he was removed in violation of a right of custody.

This Court's inquiry is shaped by the text of the Convention; the views of the United States Department of State; decisions addressing the meaning of "rights of custody" in courts of other contracting states; and the purposes of the Convention. After considering these sources, the Court determines that Mr. Abbott's *ne exeat* right is a right of custody under the Convention.

A

"The interpretation of a treaty, like the interpretation of a statute, begins with its text." *Medellín* v. *Texas*, 552 U. S. 491, 506 (2008). This Court consults Chilean law to determine the content of Mr. Abbott's right, while following the Convention's text and structure to decide whether the right at issue is a "righ[t] of custody."

Chilean law granted Mr. Abbott a joint right to decide his child's country of residence, otherwise known as a *ne exeat* right. Minors Law 16,618, art. 49 (Chile), App. to Pet. for Cert. 61a, 62a, provides that "[o]nce the court has decreed" that one of the parents has visitation rights, that parent's "authorization . . . shall also be required" before the child may be taken out of the country, subject to court override only where authorization "cannot be granted or is denied without good reason." Mr. Abbott has "direct and regular" visitation rights and it follows from Chilean law, that he has a shared right to determine his son's country of residence under this provision. App. 9. To support the conclusion that Mr. Abbott's right under Chilean law gives him a joint right to decide his son's country of residence, it is notable that a Chilean agency has explained that Minors Law 16,618 is a "right to authorize the minors' exit" from Chile and that this provision means that neither parent can "unilaterally" "establish the [child's] place of residence." Letter from Paula Strap Camus, Director General, Corporation of Judicial Assistance of the Region Metropolitana, to National Center for Missing and Ex-

ploited Children (Jan. 17, 2006), App. to Pet. for Cert. in *Villegas Duran* v. *Arribada Beaumont*, No. 08–775, pp. 35a–37a, cert. pending.

The Convention recognizes that custody rights can be decreed jointly or alone, see Art. 3*(a)*, Treaty Doc., at 7; and Mr. Abbott's joint right to determine his son's country of residence is best classified as a joint right of custody, as the Convention defines that term. The Convention defines "rights of custody" to "include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Art. 5*(a)*, *ibid.* Mr. Abbott's *ne exeat* right gives him both the joint "right to determine the child's place of residence" and joint "rights relating to the care of the person of the child."

Mr. Abbott's joint right to decide A. J. A.'s country of residence allows him to "determine the child's place of residence." The phrase "place of residence" encompasses the child's country of residence, especially in light of the Convention's explicit purpose to prevent wrongful removal across international borders. See Convention Preamble, Treaty Doc., at 7. And even if "place of residence" refers only to the child's street address within a country, a *ne exeat* right still entitles Mr. Abbott to "determine" that place. "[D]etermine" can mean "[t]o fix conclusively or authoritatively," Webster's New International Dictionary 711 (2d ed. 1954) (2d definition), but it can also mean "[t]o set bounds or limits to," *ibid.* (1st definition), which is what Mr. Abbott's *ne exeat* right allows by ensuring that A. J. A. cannot live at any street addresses outside of Chile. It follows that the Convention's protection of a parent's custodial "right to determine the child's place of residence" includes a *ne exeat* right.

Mr. Abbott's joint right to determine A. J. A.'s country of residence also gives him "rights relating to the care of the person of the child." Art. 5*(a)*, Treaty Doc., at 7. Few decisions are as significant as the language the child

speaks, the identity he finds, or the culture and traditions
she will come to absorb. These factors, so essential to self-
definition, are linked in an inextricable way to the child's
country of residence. One need only consider the different
childhoods an adolescent will experience if he or she grows
up in the United States, Chile, Germany, or North Korea,
to understand how choosing a child's country of residence
is a right "relating to the care of the person of the child."
The Court of Appeals described Mr. Abbott's right to take
part in making this decision as a mere "veto," 542 F. 3d, at
1087; but even by that truncated description, the father
has an essential role in deciding the boy's country of resi-
dence. For example, Mr. Abbott could condition his con-
sent to a change in country on A. J. A.'s moving to a city
outside Chile where Mr. Abbott could obtain an astronomy
position, thus allowing the father to have continued con-
tact with the boy.

That a *ne exeat* right does not fit within traditional
notions of physical custody is beside the point. The Con-
vention defines "rights of custody," and it is that definition
that a court must consult. This uniform, text-based ap-
proach ensures international consistency in interpreting
the Convention. It forecloses courts from relying on defi-
nitions of custody confined by local law usage, definitions
that may undermine recognition of custodial arrange-
ments in other countries or in different legal traditions,
including the civil-law tradition. And, in any case, our
own legal system has adopted conceptions of custody that
accord with the Convention's broad definition. Joint legal
custody, in which one parent cares for the child while the
other has joint decisionmaking authority concerning the
child's welfare, has become increasingly common. See
Singer, Dispute Resolution and the Postdivorce Family:
Implications of a Paradigm Shift, 47 Family Ct. Rev. 363,
366 (2009) ("[A] recent study of child custody outcomes in
North Carolina indicated that almost 70% of all custody

resolutions included joint legal custody, as did over 90% of all mediated custody agreements"); E. Maccoby & R. Mnookin, Dividing the Child: Social and Legal Dilemmas of Custody 107 (1992) ("[F]or 79% of our entire sample, the [California] divorce decree provided for joint legal custody"); see generally Elrod, Reforming the System to Protect Children in High Conflict Custody Cases, 28 Wm. Mitchell L. Rev. 495, 505–508 (2001).

Ms. Abbott gets the analysis backwards in claiming that a *ne exeat* right is not a right of custody because the Convention requires that any right of custody must be capable of exercise. The Convention protects rights of custody when "at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention." Art. 3*(b)*, Treaty Doc., at 7. In cases like this one, a *ne exeat* right is by its nature inchoate and so has no operative force except when the other parent seeks to remove the child from the country. If that occurs, the parent can exercise the *ne exeat* right by declining consent to the exit or placing conditions to ensure the move will be in the child's best interests. When one parent removes the child without seeking the *ne exeat* holder's consent, it is an instance where the right would have been "exercised but for the removal or retention." *Ibid.*

The Court of Appeals' conclusion that a breach of a *ne exeat* right does not give rise to a return remedy would render the Convention meaningless in many cases where it is most needed. The Convention provides a return remedy when a parent takes a child across international borders in violation of a right of custody. The Convention provides no return remedy when a parent removes a child in violation of a right of access but requires contracting states "to promote the peaceful enjoyment of access rights." Art. 21, *id.,* at 11. For example, a court may force the custodial parent to pay the travel costs of visitation,

see, *e.g., Viragh* v. *Foldes*, 415 Mass. 96, 109–111, 612 N. E. 2d 241, 249–250 (1993), or make other provisions for the noncustodial parent to visit his or her child, see §11603(b) (authorizing petitions to "secur[e] the effective exercise of rights of access to a child"). But unlike rights of access, *ne exeat* rights can only be honored with a return remedy because these rights depend on the child's location being the country of habitual residence.

Any suggestion that a *ne exeat* right is a "righ[t] of access" is illogical and atextual. The Convention defines "rights of access" as "includ[ing] the right to take a child for a limited period of time to a place other than the child's habitual residence," Art. 5*(b)*, Treaty Doc., at 7, and ICARA defines that same term as "visitation rights," §11602(7). The joint right to decide a child's country of residence is not even arguably a "right to take a child for a limited period of time" or a "visitation righ[t]." Reaching the commonsense conclusion that a *ne exeat* right does not fit these definitions of "rights of access" honors the Convention's distinction between rights of access and rights of custody.

Ms. Abbott argues that the *ne exeat* order in this case cannot create a right of custody because it merely protects a court's jurisdiction over the child. Even if this argument were correct, it would not be dispositive. Ms. Abbott contends the Chilean court's *ne exeat* order contains no parental consent provision and so awards the father no rights, custodial or otherwise. See Brief for Respondent 22; but see 495 F. Supp. 2d, at 638, n. 3 (the District Court treating the order as containing a consent provision); 542 F. 3d, at 1084 (same for the Court of Appeals). Even a *ne exeat* order issued to protect a court's jurisdiction pending issuance of further decrees is consistent with allowing a parent to object to the child's removal from the country. This Court need not decide the status of *ne exeat* orders lacking parental consent provisions, however; for here the

father relies on his rights under Minors Law 16,618. Mr. Abbott's rights derive not from the order but from Minors Law 16,618. That law requires the father's consent before the mother can remove the boy from Chile, subject only to the equitable power family courts retain to override any joint custodial arrangements in times of disagreement. Minors Law 16,618; see 1 J. Atkinson, Modern Child Custody Practice §6–11 (2d ed. 2009) ("[T]he court remains the final arbiter and may resolve the [dispute between joint custodians] itself or designate one parent as having final authority on certain issues affecting the child"); *Lombardo* v. *Lombardo*, 202 Mich. App. 151, 159, 507 N. W. 2d 788, 792 (1993) ("[W]here the parents as joint custodians cannot agree on important matters such as education, it is the court's duty to determine the issue in the best interests of the child"). The consent provision in Minors Law 16,618 confers upon the father the joint right to determine his child's country of residence. This is a right of custody under the Convention.

## B

This Court's conclusion that Mr. Abbott possesses a right of custody under the Convention is supported and informed by the State Department's view on the issue. The United States has endorsed the view that *ne exeat* rights are rights of custody. In its brief before this Court the United States advises that "the Department of State, whose Office of Children's Issues serves as the Central Authority for the United States under the Convention, has long understood the Convention as including *ne exeat* rights among the protected 'rights of custody.'" Brief for United States as *Amicus Curiae* 21; see *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 184–185, n. 10 (1982) (deferring to the Executive's interpretation of a treaty as memorialized in a brief before this Court). It is well settled that the Executive Branch's interpretation of

a treaty "is entitled to great weight." *Id.,* at 185. There is no reason to doubt that this well-established canon of deference is appropriate here. The Executive is well informed concerning the diplomatic consequences resulting from this Court's interpretation of "rights of custody," including the likely reaction of other contracting states and the impact on the State Department's ability to reclaim children abducted from this country.

## C

This Court's conclusion that *ne exeat* rights are rights of custody is further informed by the views of other contracting states. In interpreting any treaty, "[t]he 'opinions of our sister signatories' . . . are 'entitled to considerable weight.'" *El Al Israel Airlines, Ltd.* v. *Tsui Yuan Tseng*, 525 U. S. 155, 176 (1999) (quoting *Air France* v. *Saks*, 470 U. S. 392, 404 (1985)). The principle applies with special force here, for Congress has directed that "uniform international interpretation of the Convention" is part of the Convention's framework. See §11601(b)(3)(B).

A review of the international case law confirms broad acceptance of the rule that *ne exeat* rights are rights of custody. In an early decision, the English High Court of Justice explained that a father's "right to ensure that the child remain[ed] in Australia or live[d] anywhere outside Australia only with his approval" is a right of custody requiring return of the child to Australia. *C.* v. *C.*, [1989] 1 W. L. R. 654, 658 (C. A.). Lords of the House of Lords have agreed, noting that *C.* v. *C.*'s conclusion is "settled, so far as the United Kingdom is concerned" and "appears to be the majority [view] of the common law world." See *In re D (A Child)*, [2007] 1 A. C. 619, 628, 633, 635 (2006).

The Supreme Court of Israel follows the same rule, concluding that "the term 'custody' should be interpreted in an expansive way, so that it will apply [i]n every case in which there is a need for the consent of one of the parents

to remove the children from one country to another." CA 5271/92 *Foxman* v. *Foxman*, [1992], §§3(D), 4 (K. Chagall transl.). The High Courts of Austria, South Africa, and Germany are in accord. See Oberster Gerichtshof [O. G. H.] [Supreme Court] Feb. 5, 1992, 2 Ob 596/91 (Austria) ("Since the English Custody Court had ordered that the children must not be removed from England and Wales without the father's written consent, both parents had, in effect, been granted joint custody concerning the children's place of residence"); *Sonderup* v. *Tondelli*, 2001(1) SA 1171, 1183 (Constitutional Ct. of South Africa 2000) ("[The mother's] failure to return to British Columbia with the child . . . was a breach of the conditions upon which she was entitled to exercise her rights of custody and . . . therefore constituted a wrongful retention . . . as contemplated by [Article 3] of the Convention"); Bundesverfassungsgericht [BVerfG] [Federal Constitutional Court of Germany] July 18, 1997, 2 BvR 1126/97, ¶15 (the Convention requires a return remedy for a violation of the "right to have a say in the child's place of residence"). Appellate courts in Australia and Scotland agree. See *In the Marriage of Resina* [1991] FamCA 33 (Austl., May 22, 1991), ¶¶18–27; *A. J.* v. *F. J.*, [2005] CSIH 36, 2005 1 S. C. 428, 435–436.

It is true that some courts have stated a contrary view, or at least a more restrictive one. The Canadian Supreme Court has said *ne exeat* orders are "usually intended" to protect access rights. *Thomson* v. *Thomson,* [1994] 3 S. C. R. 551, 589–590, 119 D. L. R. (4th) 253, 281; see *D. S.* v. *V. W.*, [1996] 2 S. C. R. 108, 134 D. L. R. (4th) 481. But the Canadian cases are not precisely on point here. *Thomson* ordered a return remedy based on an interim *ne exeat* order, and only noted in dicta that it may not order such a remedy pursuant to a permanent *ne exeat* order. See [1994] 3 S. C. R., at 589–590, 119 D. L. R. (4th), at 281. *D. S.* involved a parent's claim based on an im-

plicit *ne exeat* right and, in any event, the court ordered a
return remedy on a different basis. See [1996] 2 S. C. R.,
at 140–141, 142, 134 D. L. R. (4th), at 503–504, 505.

French courts are divided. A French Court of Appeals
held that "the right to accept or refuse the removal of the
children's residence" outside of a region was "a joint exer-
cise of rights of custody." *Public Ministry* v. *M. B.*, [CA]
Aix-en-Provence, 6e ch., Mar. 23, 1989, Rev. crit. dr. inter-
nat. Privé 79(3), July–Sept. 1990, 529, 533–535. A trial
court in a different region of France rejected this view,
relying on the mother's "fundamental liberty" to establish
her domicil. See *Attorney for the Republic at Périgueux* v.
*Mrs. S.*, [T. G. I.] Périgueux, Mar. 17, 1992, Rev. cr. dr.
internat. Privé 82(4) Oct.–Dec. 1993, 650, 651–653, note
Bertrand Ancel, D. 1992, note G. C.

Scholars agree that there is an emerging international
consensus that *ne exeat* rights are rights of custody, even if
that view was not generally formulated when the Conven-
tion was drafted in 1980. At that time, joint custodial
arrangements were unknown in many of the contracting
states, and the status of *ne exeat* rights was not yet well
understood. See 1980 Conférence de La Haye de droit
international privé, Enlèvement d'enfants, morning meet-
ing of Wed., Oct. 8, 1980 (discussion by Messrs. Leal & van
Boeschoten), in 3 Actes et Documents de la Quatorzième
session, pp. 263–266 (1982) (Canadian and Dutch dele-
gates disagreeing whether the Convention protected
*ne exeat* rights, while agreeing that it should protect such
rights). Since 1980, however, joint custodial arrange-
ments have become more common. See *supra*, at 8–9.
And, within this framework, most contracting states and
scholars now recognize that *ne exeat* rights are rights of
custody. See, *e.g.,* Hague Conference on Private Interna-
tional Law: Transfrontier Contact Concerning Children:
General Principles and Guide to Good Practice §9.3, p. 43
(2008) ("[P]reponderance of the case law supports the

view" that *ne exeat* rights are "rights of custody" (footnote omitted)); Hague Conference on Private International Law: Overall Conclusions of the Special Commission of Oct. 1989 on the Operation of the Hague Convention of 25 Oct. 1980 on the Civil Aspects of International Child Abduction, reprinted in 29 I. L. M. 219, 222, ¶9 (1990); Hague Conference on Private International Law: Report of the Second Special Commission Meeting to Review the Operation of the Hague Convention on the Civil Aspects of International Child Abduction 11 (1993), reprinted in 33 I. L. M. 225 (1994); Silberman, The Hague Child Abduction Convention Turns Twenty: Gender Politics and Other Issues, 33 N. Y. U. J. Int'l L. & Pol. 221, 226–232, and n. 13 (2000); Whitman, *Croll v. Croll:* The Second Circuit Limits "Custody Rights" Under the Hague Convention on the Civil Aspects of International Child Abduction, 9 Tulane J. Int'l & Comp. L. 605, 611–616 (2001).

A history of the Convention, known as the Pérez-Vera Report, has been cited both by the parties and by Courts of Appeals that have considered this issue. See 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report (Pérez-Vera Report or Report), in 3 Actes et Documents de la Quatorzième session, pp. 425–473 (1982). We need not decide whether this Report should be given greater weight than a scholarly commentary. Compare Hague International Child Abduction Convention; Text and Legal Analysis, 51 Fed. Reg. 10503–10506 (1986) (identifying the Report as the "official history" of the Convention and "a source of background on the meaning of the provisions of the Convention"), with Pérez-Vera Report ¶8, at 427–428 ("[the Report] has not been approved by the Conference, and it is possible that, despite the Rapporter's *[sic]* efforts to remain objective, certain passages reflect a viewpoint which is in part subjective"). It suffices to note that the Report supports the conclusion that *ne exeat* rights are

rights of custody. The Report explains that rather than defining custody in precise terms or referring to the laws of different nations pertaining to parental rights, the Convention uses the unadorned term "rights of custody" to recognize "*all* the ways in which custody of children can be exercised" through "a flexible interpretation of the terms used, which allows the greatest possible number of cases to be brought into consideration." *Id.,* ¶¶67, 71, at 446, 447–448. Thus the Report rejects the notion that because *ne exeat* rights do not encompass the right to make medical or some other important decisions about a child's life they cannot be rights of custody. Indeed, the Report is fully consistent with the conclusion that *ne exeat* rights are just one of the many "ways in which custody of children can be exercised." *Id.,* ¶ 71, at 447.

## D

Adopting the view that the Convention provides a return remedy for violations of *ne exeat* rights accords with its objects and purposes. The Convention is based on the principle that the best interests of the child are well served when decisions regarding custody rights are made in the country of habitual residence. See Convention Preamble, Treaty Doc., at 7. Ordering a return remedy does not alter the existing allocation of custody rights, Art. 19, *id.,* at 11, but does allow the courts of the home country to decide what is in the child's best interests. It is the Convention's premise that courts in contracting states will make this determination in a responsible manner.

Custody decisions are often difficult. Judges must strive always to avoid a common tendency to prefer their own society and culture, a tendency that ought not interfere with objective consideration of all the factors that should be weighed in determining the best interests of the child. This judicial neutrality is presumed from the mandate of the Convention, which affirms that the contracting states

are "[f]irmly convinced that the interests of children are of paramount importance in matters relating to their custody." Convention Preamble, Treaty Doc., at 7. International law serves a high purpose when it underwrites the determination by nations to rely upon their domestic courts to enforce just laws by legitimate and fair proceedings.

To interpret the Convention to permit an abducting parent to avoid a return remedy, even when the other parent holds a *ne exeat* right, would run counter to the Convention's purpose of deterring child abductions by parents who attempt to find a friendlier forum for deciding custodial disputes. Ms. Abbott removed A. J. A. from Chile while Mr. Abbott's request to enhance his relationship with his son was still pending before Chilean courts. After she landed in Texas, the mother asked the state court to diminish or eliminate the father's custodial and visitation rights. The Convention should not be interpreted to permit a parent to select which country will adjudicate these questions by bringing the child to a different country, in violation of a *ne exeat* right. Denying a return remedy for the violation of such rights would "legitimize the very action—removal of the child—that the home country, through its custody order [or other provision of law], sought to prevent" and would allow "parents to undermine the very purpose of the Convention." *Croll*, 229 F. 3d, at 147 (Sotomayor, J., dissenting). This Court should be most reluctant to adopt an interpretation that gives an abducting parent an advantage by coming here to avoid a return remedy that is granted, for instance, in the United Kingdom, Israel, Germany, and South Africa. See *supra*, at 12–13.

Requiring a return remedy in cases like this one helps deter child abductions and respects the Convention's purpose to prevent harms resulting from abductions. An abduction can have devastating consequences for a child.

"Some child psychologists believe that the trauma children suffer from these abductions is one of the worst forms of child abuse." H. R. Rep. No. 103–390, p. 2 (1993). A child abducted by one parent is separated from the second parent and the child's support system. Studies have shown that separation by abduction can cause psychological problems ranging from depression and acute stress disorder to posttraumatic stress disorder and identity-formation issues. See N. Faulkner, Parental Child Abduction is Child Abuse (1999), http://www.prevent-abuse-now.com/unreport.htm (as visited May 13, 2010, and available in Clerk of Court's case file). A child abducted at an early age can experience loss of community and stability, leading to loneliness, anger, and fear of abandonment. See Huntington, Parental Kidnapping: A New Form of Child Abuse (1982), in American Prosecutors Research Institute's National Center for Prosecution of Child Abuse, Parental Abduction Project, Investigation and Prosecution of Parental Abduction (1995) (App. A). Abductions may prevent the child from forming a relationship with the left-behind parent, impairing the child's ability to mature. See Faulkner, *supra*, at 5.

IV

While a parent possessing a *ne exeat* right has a right of custody and may seek a return remedy, a return order is not automatic. Return is not required if the abducting parent can establish that a Convention exception applies. One exception states return of the child is not required when "there is a grave risk that his or her return would expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Art. 13*(b)*, Treaty Doc., at 10. If, for example, Ms. Abbott could demonstrate that returning to Chile would put her own safety at grave risk, the court could consider whether this is sufficient to show that the child too would suffer "psy-

chological harm" or be placed "in an intolerable situation." See, *e.g., Baran* v. *Beaty*, 526 F. 3d 1340, 1352–1353 (CA11 2008); *Walsh* v. *Walsh*, 221 F. 3d 204, 220–221 (CA1 2000). The Convention also allows courts to decline to order removal if the child objects, if the child has reached a sufficient "age and degree of maturity at which it is appropriate to take account of its views." Art. 13*(b)*, Treaty Doc., at 10. The proper interpretation and application of these and other exceptions are not before this Court. These matters may be addressed on remand.

\*  \*  \*

The judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

———————

No. 08–645

———————

## TIMOTHY MARK CAMERON ABBOTT, PETITIONER *v.* JACQUELYN VAYE ABBOTT

### ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT

[May 17, 2010]

JUSTICE STEVENS, with whom JUSTICE THOMAS and JUSTICE BREYER join, dissenting.

Petitioner Timothy Abbott, the father of A. J. A., has no authority to decide whether his son undergoes a particular medical procedure; whether his son attends a school field trip; whether and in what manner his son has a religious upbringing; or whether his son can play a videogame before he completes his homework. These are all rights and responsibilities of A. J. A.'s mother, respondent Jacquelyn Abbott. It is she who received sole custody, or "daily care and control," of A. J. A. when the expatriate couple divorced while living in Chile in 2004. 495 F. Supp. 2d 635, 637, and n. 2 (WD Tex. 2007). Mr. Abbott possesses only visitation rights.

On Ms. Abbott's custodial rights, Chilean law placed a restriction: She was not to travel with her son outside of Chile without either Mr. Abbott's or the court's consent. Put differently, Mr. Abbott had the opportunity to veto Ms. Abbott's decision to remove A. J. A. from Chile unless a Chilean court overrode that veto. The restriction on A. J. A.'s and Ms. Abbott's travel was an automatic, default provision of Chilean law operative upon the award of visitation rights under Article 48 of Chile's Minors Law 16,618. It is this travel restriction—also known as a *ne exeat* clause—that the Court today declares is a "'righ[t] of

custody'" within the meaning of the Hague Convention on
the Civil Aspects of International Child Abduction (Con-
vention), Oct. 25, 1980, T. I. A. S. No. 11670, S. Treaty
Doc. No. 99–11. *Ante*, at 1.

Because the Court concludes that this travel restriction
constitutes a right of custody, and because Ms. Abbott
indisputably violated the restriction when she took A. J. A.
from Chile without either Mr. Abbott's or the court's per-
mission, Mr. Abbott is now entitled to the return of
A. J. A. to Chile under the terms of the Convention. Thus,
absent a finding of an exception to the Convention's pow-
erful return remedy, see *ante*, at 18–19, and even if the
return is contrary to the child's best interests, an Ameri-
can court *must* now order the return of A. J. A. to Mr.
Abbott, who has no legal authority over A. J. A., based
solely on his possessing a limited veto power over Ms.
Abbott's ability to take A. J. A. from Chile. As I shall
explain, use of the Convention's return remedy under
these circumstances is contrary to the Convention's text
and purpose.

I

When the drafters of the Convention gathered in 1980,
they sought an international solution to an emerging
problem: transborder child abductions perpetrated by
noncustodial parents "to establish artificial jurisdictional
links . . . with a view to obtaining custody of a child." 1980
Conférence de La Haye de droit international privé,
Enlèvement d'enfants, E. Pérez-Vera, Explanatory Report
(Pérez-Vera Report), in 3 Actes et Documents de la Qua-
torzième session ¶11, p. 426 (1982);[1] see also Convention

---

[1] As the Court recognizes, see *ante*, at 15, the Executive Branch con-
siders the Pérez-Vera Report "the 'official history' " for the Convention
and "a source of background on the meaning of the provisions of the
Convention available to all States becoming parties to it." Legal
Analysis of Hague Convention on the Civil Aspects of International

Analysis 1054 ("[F]undamental purpose" of the Convention is "to protect children from wrongful international removals or retention by persons bent on obtaining their physical and/or legal custody"). The drafters' primary concern was to remedy abuses by noncustodial parents who attempt to circumvent adverse custody decrees (*e.g.*, those granting sole custodial rights to the other parent) by seeking a more favorable judgment in a second nation's family court system. Pérez-Vera Report ¶14, at 429.

The drafters determined that when a *noncustodial* parent abducts a child across international borders, the best remedy is return of that child to his or her country of habitual residence—or, in other words, the best remedy is return of the child to his or her *custodial* parent. *Id.*, ¶18, at 430. The drafters concluded that the same remedy should not follow, however, when a *custodial* parent takes a child from his or her country of habitual residence in breach of the other parent's visitation rights, or "rights of access" in the Convention's parlance. *Id.*, ¶65, at 444–445. The distinction between rights of custody and rights of access, therefore, is critically important to the Convention's scheme and purpose. It defines the scope of the available Convention remedies.

Article 5 defines these rights as follows:

> "For the purposes of this Convention—
> "*a* 'rights of custody' shall include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence;
> "*b* 'rights of access' shall include the right to take a child for a limited period of time to a place other than the child's habitual residence." S. Treaty Doc. No. 99–11, at 7 (hereinafter Treaty Doc.).

_____

Child Abduction, 51 Fed. Reg. 10503 (1986) (hereinafter Convention Analysis).

Article 3 of the Convention provides that the removal or retention of a child is "wrongful," and thus in violation of the Convention, only when the removal "is in breach of the rights of custody." Art. 3*(a)*, *ibid.* The fact that a removal may be "wrongful" in the sense that it violates domestic law or violates only "rights of access" does not make it "wrongful" within the meaning of the Convention.

Only when a removal is "wrongful" under Article 3 may the parent who possesses custody rights force the child's return to the country of habitual residence under the Convention's remedial procedures, pursuant to Articles 8 through 20. For those removals that frustrate a noncustodial parent's "rights of access," the Convention provides that the noncustodial parent may file an application "to make arrangements for organizing or securing the effective exercise of rights of access"; but he may not force the child's return. Art. 21, *id.*, at 11. A parent without "rights of custody," therefore, does not have the power granted by Article 3 to compel the child's return to his or her country of habitual residence. His rights are limited to those set forth in Article 21.

## II

Mr. Abbott, claiming "rights of custody" by virtue of the travel restriction Chilean law places on Ms. Abbott, seeks the return of A. J. A. to Chile. Such relief is warranted only if A. J. A.'s removal was "wrongful" within the meaning of the Convention; as such, it must have been "in breach of [Mr. Abbott's] rights of custody."[2] Art. 3, *id.*, at

_____

[2] Indisputably, Ms. Abbott's removal of A. J. A. from Chile was wrongful in the generic sense of the word. She violated Chilean law when she took A. J. A. to Texas because she sought neither Mr. Abbott's permission nor the court's authorization before doing so. She violated both the existing "*ne exeat*" order imposed by judicial decree in the couple's custody dispute, see *ante*, at 2, as well as Chilean statutory law defining the access rights of noncustodial parents, see Art. 49, Minors Law 16,618, App. to Pet. for Cert. 61a. The removal was illegal, then, but it

7. Putting aside the effect of the travel restriction, it is undisputed that Ms. Abbott possesses "rights of custody" over A. J. A. while Mr. Abbott would possess "rights of access," as those terms are used in the Convention. Brief for Petitioner 6; Brief for Respondent 6. The only issue in this case, therefore, is whether Mr. Abbott also possesses "rights of custody" within the meaning of the Convention by virtue of the travel restriction, or *ne exeat* clause,[3] that Chilean law imposes on Ms. Abbott. In other words, the question is whether the "right" of one parent to veto the other parent's decision to remove a child from the country, subject to judicial override, belongs in the category of "rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence." Art. 5*(a)*, Treaty Doc., at 7. In my judgment, it clearly does not, and I need look no further than to the Convention's text to explain why. See *Medellín* v. *Texas*, 552 U. S. 491, 506 (2008) ("The interpretation of a treaty, like the interpretation of a statute, begins with its text").

*Rights relating to the care of the child.* The Court concludes that the veto power Mr. Abbott has over Ms. Abbott's travel plans is equivalent to those rights "'relating to the care of the person of the child.'" *Ante*, at 7–8. This is so, the Court tells us, because Mr. Abbott has a limited power to keep A. J. A. within Chile's bounds and, therefore, indirectly to influence "the language the child speaks,

---

was only wrongful within the meaning of the Convention if it was in breach of Mr. Abbott's rights of custody. Unfortunately, I fear the Court's preoccupation with deterring parental misconduct—even, potentially, at the sake of the best interests of the child—has caused it to minimize this important distinction.

[3] The Court repeatedly refers to "*ne exeat* rights," *ante*, at 3, 10, 11, 12, 14, 15, and 16, as if the single travel restriction at issue in this case were on a par with the multiple rights commonly exercised by custodial parents. Chile's statutory *ne exeat* provision is better characterized as a restriction on the travel of both the minor and the custodial parent than as a bundle of "rights" possessed by the noncustodial parent.

the identity he finds, or the culture and traditions she will come to absorb." *Ante*, at 7. It is not nearly as self-evident as the Court assumes that Mr. Abbott's veto power carries with it any ability to decide the language A. J. A. speaks or the cultural experiences he will have, *ante*, at 7–8. A. J. A.'s mere presence in Chile does not determine any number of issues, including: whether A. J. A. learns Spanish while there; whether he attends an American school or a British school or a local school; whether he participates in sports; whether he is raised Catholic or Jewish or Buddhist or atheist; whether he eats a vegetarian diet; and on and on. The travel restriction does *not* confer upon Mr. Abbott affirmative power to make any number of decisions that are vital to A. J. A.'s physical, psychological, and cultural development. To say that a limited power to veto a child's travel plans confers, also, a right "relating to the care" of that child devalues the great wealth of decisions a custodial parent makes on a daily basis to attend to a child's needs and development.

The Court's interpretation depends entirely on a broad reading of the phrase "relating to" in the Convention's definition of "rights of custody." It is, undeniably, broad language. But, as the Court reads the term, it is so broad as to be utterly unhelpful in interpreting what "rights of custody" means. We "cannot forget that we ultimately are determining the meaning of the term" rights of custody in this case, and we should not lose sight of the import of this term in construing the broad words that follow in its wake. *Leocal* v. *Ashcroft*, 543 U. S. 1, 11 (2004). I suppose it could be said that Mr. Abbott's ability to decide whether A. J. A. spends the night with one of his friends during a Saturday visit is also a "right relating to the care of the child." Taken in the abstract—and to its most absurd— *any* decision on behalf of a child could be construed as a right "relating to" the care of a child.

Such a view of the text obliterates the careful distinction the drafters drew between the rights of custody and the rights of access. Undoubtedly, they were aware of the concept of joint custody. See Pérez-Vera Report ¶71, at 457 ("[C]ustody rights may have been awarded . . . to that person in his own right or jointly. It cannot be otherwise in an era when types of joint custody, regarded as best suited to the general principle of sexual non-discrimination, are gradually being introduced into internal law"). But just because rights of custody can be shared by two parents, it does not follow that the drafters intended this limited veto power to be a right of custody. And yet this, it seems, is how the Court understands the case: Because the drafters intended to account for joint custodial arrangements, they intended for *this* travel restriction to be joint custody because it could be said, in some abstract sense, to relate to care of the child. I fail to understand how the Court's reading is faithful to the Convention's text and purpose, given that the text expressly contemplates two distinct classes of parental rights. Today's decision converts every noncustodial parent with access rights—at least in Chile—into a custodial parent for purposes of the Convention.

On this point, it is important to observe the effect of the Court's decision to classify the travel restriction as a right "relating to" A. J. A.'s care. Mr. Abbott possesses no legal authority presently to exercise care or control of A. J. A., or to make decisions on his behalf. The Court would nevertheless read the Convention to require A. J. A.'s return to a parent without such rights merely because the travel restriction, in an abstract sense, could be said to relate to A. J. A.'s care. The Court fails to explain how a parent who otherwise possesses no legal authority to exercise "charge," "supervision," or "management" over a child, see Webster's Third New International Dictionary 338 (1986) (hereinafter Webster's) (5th definition of "care"), can be-

come a joint custodian of a child merely because he can attempt to veto one of the countless decisions the child's other parent has sole legal authority to make on the child's behalf.

*The right to determine the child's place of residence.* The Court also concludes that Mr. Abbott's veto power satisfies the Convention's definition of custodial rights because it is, in the Court's view, a "right to determine the child's place of residence." Art. 5*(a)*, Treaty Doc., at 7. I disagree with the Court's assessment of the significance and meaning of this phrase, both on its face and within the context of the Convention's other provisions.

As an initial matter, the Court's reading of the Convention depends on isolating the phrase "and, in particular, the right to determine the child's place of residence" to refer to a freestanding right separate and apart from the rights related to the care of the child. I do not agree with this view of the text, nor did the Convention's drafters:

> "The Convention seeks to be more precise by emphasizing, as an *example* of the 'care' referred to [in the "'rights of custody'" clause, Art. 5*(a)*], the right to determine the child's place of residence. However, if the child, although still a minor at law, has the right itself to determine its own place of residence, the *substance* of the custody rights will have to be determined in the context of other rights concerning the person of the child." Pérez-Vera Report ¶84, at 452 (emphasis added).

The drafters thus intended the "right to determine the child's place of residence" to be an "example" of what the Convention means by "care of the person of the child." It is indicative of the "substance" of what it means to be a custodial parent. The definition is not, as the Court would have it, one stick in the bundle that may be parsed as a singular "'righ[t] of custody,'" *ante*, at 1; rather, it is a

shorthand method to assess what types of rights a parent may have. The parent responsible for determining where and with whom a child resides, the drafters assumed, would likely *also* be the parent who has the responsibility to "care" for the child.

Yet even assuming, as the Court does, that the "right to determine the child's place of residence," Art. 5*(a)*, Treaty Doc., at 7*,* is divisible from the "care" of the child, *ibid.*, I still fail to understand how a travel restriction on one parent's exercise of her custodial rights is equivalent to an affirmative "*right to determine* the child's place of residence." Analyzing its text, in the context of the Convention's focus on distinguishing custodial parents from noncustodial ones, leads me to conclude that the "right to determine the child's place of residence" means the power to set or fix the location of the child's home. It does not refer to the more abstract power to keep a child within one nation's borders.

"To determine" means "to fix conclusively or authoritatively" or "to settle a question or controversy."[4] Webster's 616. A "place" is a "physical environment" or "a building or locality used for a special purpose." *Id.*, at 1727. "Resi-

_____

[4] "To determine" can also mean, as the Court observes, " 'to set bounds or limits to,' " *ante*, at 7 (quoting Webster's New International Dictionary 711 (2d ed. 1954) (1st definition) (hereinafter Webster's 2d)). However, this definition of "to determine" makes little functional sense as applied to this treaty. In the context of understanding the meaning of rights of custody, the phrase "to determine" cannot be so indeterminate as to merely set "limits to" a child's place of residence.

Although the Court emphasizes that the definition of "to determine" on which it relies is the first such entry in Webster's, *ante*, at 7, it is worth noting that surely the Court would not rely on the first such definition of the word "care" in that source ("suffering of mind; grief; sorrow") to understand the Convention's use of that word. See Webster's 2d, at 405. Instead, the fifth definition of that word—"charge, supervision, management"—is clearly the relevant one. The point is only that context, as well as common sense, matters when selecting among possible definitions.

dence," even standing alone, refers to a particular location—and not, more generally, to a nation or country. In the law, "residence" can mean: "[t]he act or fact of living in a given place for some time"; "[t]he place where one actually lives"; or, "[a] house or other fixed abode; a dwelling." Black's Law Dictionary 1423 (9th ed. 2009).[5] Lay definitions of "residence" similarly describe a specific location: "the act or fact of abiding or dwelling in a place for some time"; "the place where one actually lives or has his home"; or, "a temporary or permanent dwelling place, abode, or habitation." Webster's 1931. It follows that a "place of residence" describes a "physical" location in which a child "actually lives."

The Court's reading of this text depends on its substitution of the word "country" for the word "place." Such a substitution is not illogical, of course, in light of the Convention's international focus. See *Croll* v. *Croll*, 229 F. 3d 133, 147, 148 (CA2 2000) (Sotomayor, J., dissenting) (reading "place of residence" to mean "authority over the child's more specific living arrangements" "ignores the basic international character of the Hague Convention"). But it is inconsistent with the Convention's text and purpose.

When the drafters wanted to refer to country, they did. For example, in Article 3, the drafters explained that rights of custody should be defined by looking to "the law of the State in which the child was habitually resident." Art. 3*(a)*, Treaty Doc., at 7. Had the drafters intended the definition of the child's "place of residence" in Article 5 to refer to his or her "State" or country of "residence," they

―――――――――

[5] "Residence" can also refer to "[t]he place where a corporation or other enterprise does business or is registered to do business." Black's Law Dictionary 1423. Earlier this Term, we recognized the self-evident principle that a corporation's principal "place" of business for diversity jurisdiction purposes is a single location "*within* a State" and "not the State itself." *Hertz Corp.* v. *Friend*, 559 U. S. ___, ___ (2010) (slip op., at 14).

could have defined the "right" at issue as "the right to determine the child's State of habitual residence." But they did not, even though they used the phrase "State of habitual residence" no fewer than four other times elsewhere within the Convention's text.[6] Moreover, the drafters also explained that "reference[s] to habitual residence in [a] State shall be construed as referring to habitual residence in a *territorial unit of that State*." Art. 31*(a)*, *id.*, at 13 (emphasis added). The point is: When the drafters wanted to refer to a particular geographic unit, they did so.

Instead, the drafters elected the formulation "place of residence," which is also utilized similarly in the definition of "rights of access." See Art. 5*(b)*, *id.*, at 7 (defining "'rights of access'" to include "the right to take a child for a limited period of time to a *place* other than the child's habitual residence" (emphasis added)). And they utilized this phrase only within one particular Article, as opposed to their more frequent use of "State of habitual residence" throughout the Convention. In interpreting statutory text, we ordinarily presume that the use of different words is purposeful and evinces an intention to convey a different meaning. See, *e.g.*, *Russello* v. *United States*, 464 U. S.

---

[6] See, *e.g.*, Preamble, Treaty Doc., at 7 ("Desiring to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the *State of their habitual residence*" (emphasis added)); Art. 8*(f)*, Treaty Doc., at 9 (stating that an application for return may be accompanied by "a certificate . . . emanating from . . . competent authority of the *State of the child's habitual residence*" (emphasis added)); Art. 14, *id.*, at 10 (explaining that when determining whether a removal is wrongful, a contracting state "may take notice directly of the law of . . . the *State of the habitual residence of the child*" (emphasis added)); Art. 15, *ibid.* (authorizing contracting state to obtain a decree from "the authorities of the *State of the habitual residence of the child*" a decision on whether removal was wrongful before ordering return (emphasis added)).

16, 23 (1983) ("We refrain from concluding here that the differing language in the two subsections has the same meaning in each. We would not presume to ascribe this difference to a simple mistake in draftsmanship"). There is no reason we should presume otherwise in the context of treaties.

Accordingly, I would give "place of residence" the location-specific meaning its plain text connotes, irrespective of the fact that this Convention concerns international abduction. The right described by the Convention is the right to decide, conclusively, where a child's home will be. And this makes a good deal of sense. The child lives with the parent who has custodial rights or, in the language of the Convention, "care of the person of the child," Art. 5*(a)*, Treaty Doc., at 7. The child's home—his or her "place of residence"—is fixed by the custody arrangement.[7] This comports too with the Convention's decision to privilege the rights of custodians over the rights of those parents with only visitation rights.

*Understanding the effect of a travel restriction.* So, the question we confront is whether a travel restriction on one parent's right to embark on international travel with his or her child creates in the other parent a "right to determine the child's place of residence" or the ability "to fix conclusively" the child's "physical" "home." Before answering this question, it is important to understand the nature of the travel restriction we must classify.

The departure of a minor from Chile—including when that child lives in a married, two-parent household—is governed by Article 49 of §16,618 of that country's Minors Law. Under Chilean law, no minor is allowed outside of

———————
[7] I do not mean to suggest by my view of the significance of a travel restriction that there could not be a custody arrangement in which both parents have the "right to determine the child's place of residence." Art. 5*(a)*, *id.*, at 7. My view is only that the type of *ne exeat* provision at issue in this case does not, by itself, confer such an affirmative right.

the country without his or her parents' authorization. Art. 49, Minors Law 16,618, App. to Pet. for Cert. 61a–62a. Ordinarily, if the judge has entrusted custody of a child to only one parent, the child may not leave without that parent's—the custodial parent's—permission. See *ibid.;* see also *id.,* at 61a ("If the judge has entrusted custody to one of the parents or to a third party, the legitimate child may not leave except under authorization of the person to whom he has been entrusted"). But the statute further provides that if the noncustodial parent has been granted visitation rights, the authorization of the parent with visitation rights shall also be required: "Once the court has decreed the obligation to allow visits pursuant to the preceding article,[8] authorization of the father or mother who has the right to visit a child shall also be required." *Ibid.* (footnote added). The statute provides, also, an important backstop in the event a noncustodial parent denies authorization "without good reason": A Chilean court may grant the minor or his parent permission to leave the country. *Id.*, at 62a. Finally, if the custodial parent does not return the child to Chile within the time authorized, "the judge may decree the suspension of alimony that may have been decreed." *Ibid.*

Returning, then, to the question at hand: By virtue of

_____

[8] The "preceding article" referred to, Article 48, simply provides: "Each time a minor is entrusted to one of the parents or a third person, such decision must include the obligation to allow the non-custodial parent to exercise his or her right to visit. The decision should also specify the way in which this right will be exercised. The judge may order ex officio, upon the parties petition or in special cases, that the same authorization be extended, to the minor's ascendants or siblings, through the means and under the conditions set by the judge. Ascendants and siblings should be identified." Memorandum from Graciela I. Rodriguez-Ferrand, Senior Legal Specialist, Law Library of Congress, to Supreme Court Library (Apr. 1, 2010) (available in Clerk of Court's case file (containing English translation of Art. 48, Minors Law 16,618)).

the restriction Chilean law places on Ms. Abbott's move-
ment, Mr. Abbott has no "right to determine [A. J. A.'s]
place of residence." He cannot "conclusively" "fix," "settle,"
or "determine" the place where A. J. A. "actually lives or
has his home." See *supra*, at 9–10. True, the travel re-
striction bestows upon the noncustodial parent a limited
power to prevent his child from leaving the country with-
out his permission, but it does not grant an affirmative
power to fix or set the location of the child's home. Mr.
Abbott has no power whatever to determine where A. J. A.
actually lives within the nearly 300,000 square miles that
compose Chile. Even more important, Mr. Abbott has no
power whatever to select another country in which A. J. A.
would live, were Mr. Abbott's work to take him to another
country altogether. In sum, a right to object to a proposed
departure gives a parent far less authority than a right to
determine where the child shall reside. Moreover, the
right to determine where to live within a country, as well
as what country to live in, is far broader than the limited
right to object to a child's travel abroad.

In my view, the "right" Mr. Abbott has by virtue of the
travel restriction is therefore best understood as relating
to his "rights of access," as the Convention defines that
term—and not as a standalone "'righ[t] of custody,'" as the
Court defines it, *ante*, at 1. Chile's statutory travel re-
striction provision is plainly ancillary to the access rights
the Chilean family court granted to him as the noncusto-
dial parent. By its terms, the obligation on the custodial
parent to seek the other parent's permission before remov-
ing the child from Chile only operates upon the award of
*visitation rights;* it has nothing to do with *custody rights*.
And it operates automatically to facilitate the noncusto-
dial parent's ability to access the child and to exercise his
visitation rights. In the best of all possible circumstances,
Mr. Abbott's limited veto power assures him relatively
easy access to A. J. A. so that he may continue a meaning-

ful relationship with his son. But this power, standing
alone, does not transform him into a *custodian* for pur-
poses of the Convention's return remedy. Instead, it au-
thorizes him, pursuant to Article 21, to seek assistance
from this country in carrying out the Chilean family
court's visitation order.

## III

Although the Court recognizes, as it must, that " '[t]he
interpretation of a treaty, like the interpretation of a
statute, begins with its text,' " *ante*, at 6 (quoting *Medellín,*
552 U. S., at 506), the Court's analysis is atextual—at
least as far as the Convention's text goes. The Court first
relies on the text of the Chilean law at issue and a single
Chilean administrator's alleged interpretation thereof.[9]

_____

[9] Because differences in statutory provisions, as well as cultural
differences and personal predilections, may affect the opinions of local
officials, I would attach no weight to the letter from Paula Strap
Camus, describing Article 49 of Chile's Minors Law 16,618 as establish-
ing a shared right to determine the place of residence of a child.
Moreover, we have no obligation to defer, on questions of treaty inter-
pretation, to the nonjudicial decisions of another signatory state, let
alone a return request—a piece of advocacy—filed on behalf of Chile in
another case.

In any event, the letter cited offers much less support for the Court's
position than meets the eye. Unlike in this case, in which a Chilean
court has already decreed Ms. Abbott to be A. J. A.'s sole custodian, in
*Villegas Duran* v. *Beaumont*, "no Judge of the Republic of Chile has
granted the custody of the child to her mother . . . ." Letter from Paula
Strap Camus, Director General, Corporation of Judicial Assistance of
the Region Metropolitana to National Center for Missing and Exploited
Children (Jan. 17, 2006), App. to Pet. for Cert. in *Villegas Duran* v.
*Beaumont*, O. T. 2008, No. 08–775, p. 36a. In other words, Ms. Camus'
letter request for the child's return in that case depends on a provision
of Article 49 not at issue in this case: "If the custody of a legitimate
child has not been entrusted by the judge to any of his parents or to a
third party, the child may not leave without authorization of both
parents." App. to Pet. for Cert. 61a. The travel restriction that bound
Ms. Abbott in this case, however, arose "[o]nce the court . . . decreed the
obligation to allow visits" by Mr. Abbott. *Ibid.* Although not before us,

See *ante*, at 6.  While it is true that the meaning of Chile's statute matters to our determining whether a parent has taken a child in "breach of rights of custody . . . under the law of the State in which the child was habitually resident immediately before the removal or retention," Art. 3*(a)*, Treaty Doc., at 7, it does not and should not inform what the Convention's definition of "rights of custody" means in the first place.

The Court also reminds us that the Convention's terms are to be broadly construed.  See *ante*, at 15–16.  To be sure, the Convention's leading interpretive authority informs us that the Convention's understanding of what constitutes "rights of custody" is broad and flexible.  See Pérez-Vera Report ¶¶67, 71, 84, at 446, 447, 451–452.  And we are to apply its terms to "allo[w] the greatest possible number of cases to be brought into consideration." *Id.*, ¶67, at 446.  But such breadth should not circumvent the Convention's text in order to sweep a travel restriction under the umbrella of rights of custody.

A reading as broad and flexible as the Court's eviscerates the distinction the Convention draws between rights of custody and rights of access.  Indeed, the Court's reading essentially voids the Convention's Article 21, which provides a separate remedy for breaches of rights of access.  If a violation of this type of provision were not a breach of the rights of access, I find it quite difficult to imagine what the Convention's drafters had in mind when

———————

there may be a sound basis for distinguishing the legal effect and significance of a travel restriction in effect *prior to* an award of custody to either or both parents, from one that occurs ancillary to the award of visitation rights to a parent who has no custodial rights.  Moreover, the U. S. Department of State, at the time the Convention was ratified, believed that the Convention would require return in these circumstances: "Children who are wrongfully removed or retained prior to the entry of a custody order are protected by the Convention.  There need not be a custody order in effect in order to invoke the Convention's return provisions." Convention Analysis 10505.

they created a second, lesser remedy for the breach of
access rights. The drafters obviously contemplated that
some removals might be in violation of the law of the
child's home nation, but not "wrongful" within the mean-
ing of the Convention—*i.e.*, not in breach of "rights of
custody." This is precisely why Article 5 carefully deline-
ates between the two types of parental rights in the first
place. And this is precisely why Article 21 exists.

Nevertheless, the Court has now decreed that whenever
an award of visitation rights triggers a statutory default
travel restriction provision, or is accompanied by a travel
restriction by judicial order, a parent possess a right of
custody within the meaning of the Convention. Such a
bright-line rule surely will not serve the best interests of
the child in many cases. See Pérez-Vera Report ¶25, at
432. It will also have surprising results. In Chile, for
example, as a result of this Court's decision, *all parents*—
so long as they have the barest of visitation rights—now
also have joint custody within the meaning of the Conven-
tion and the right to utilize the return remedy.[10]

It bears emphasis that such a result—treating the type

_____

[10] In 2003, the latest year for which statistics appear available,
Chile's Central Authority, which is the entity responsible for adminis-
tering its obligations under the Hague Convention, made five outgoing
"access applications" under Article 21. Hague Conference on Private
International Law, International Child Abduction, N. Lowe, A Statisti-
cal Analysis of Applications Made in 2003 Under the [1980 Hague
Convention] on the Civil Aspects of International Child Abduction, Part
II–National Reports, p. 125 (Prelim. Doc. No. 3, 2006–2007) (hereinaf-
ter Lowe Analysis). Were the Court correct—and were the view the
Court ascribes to Chile's interpretation of its own law also correct, see
*ante*, at 6–7—all of Chile's outgoing applications under the Convention
almost certainly should have been "return applications" because any
person with rights of access under Chilean law, also has a right of
custody by virtue of the statutory *ne exeat* provision. It is plain that
even Chilean officials have not thought correct the Court's interpreta-
tion of the intersection of the travel restriction in Article 49 of its
Minors Law 16,618 and the Convention.

of travel restriction at issue in this case as part of "rights of custody"—will undermine the Convention's careful balance between the "rights of custody and the "rights of access":

> "Although the problems which can arise from a *breach of access rights*, especially where the child is taken abroad by its custodian, were raised during the Fourteenth Session, the majority view was that *such situations could not be put in the same category as the wrongful removals which it is sought to prevent.*
>
> "This example, and others like it where breach of access rights profoundly upsets the equilibrium established by a judicial or administrative decision, certainly demonstrate that decisions concerning the custody of children should always be open to review. This problem however defied all efforts the Hague Conference to coordinate views thereon. *A questionable result would have been attained had the application of the Convention, by granting the same degree of protection to custody and access rights, led ultimately to the substitution of the holders of one type of right by those who held the other.*" *Id.,* ¶65, at 445 (emphasis added; footnote omitted).

It seems the very same authority on which the Court relies to support its broad, flexible reading of the Convention's terms also tell us that the drafters *expressly rejected* the very outcome the Court reaches today. Far from "render[ing] the Convention meaningless," *ante,* at 9, a faithful reading of the Convention's text avoids the very "questionable result" its drafters foresaw and attempted to preclude were they to extend "the same degree of protection" "to custody and access rights." Pérez-Vera Report ¶65, at 445.

## IV

Hence, in my view, the Convention's language is plain

and that language precludes the result the Court reaches. See *Sumitomo Shoji America, Inc.* v. *Avagliano*, 457 U. S. 176, 180 (1982). In these circumstances, the "clear import of treaty language controls" the decision. *Ibid.* To support its reading of the text, however, the Court turns to authority we utilize to aid us in interpreting ambiguous treaty text: the position of the Executive Branch and authorities from foreign jurisdictions that have confronted the question before the Court.[11] *Ante*, at 11–14. Were I to agree with the Court that it is necessary turn to these sources to resolve the question before us, I would not afford them the weight the Court does in this case.

*Views of the Department of State.* Without discussing precisely why, we have afforded "great weight" to "the meaning given [treaties] by the departments of government particularly charged with their negotiation and enforcement." *Kolovrat* v. *Oregon*, 366 U. S. 187, 194 (1961); see also *Sumitomo*, 457 U. S., at 184–185; *Factor* v. *Laubenheimer*, 290 U. S. 276, 294 (1933). We have awarded "great weight" to the views of a particular government department even when the views expressed by the department are newly memorialized, see *Sumitomo*, 457 U. S., at 184, n. 10, and even when the views appear contrary to those expressed by the department at the time of the treaty's signing and negotiation, *ibid.* In this case, it appears that both are true: The Department of State's position, which supports the Court's conclusion, is newly memorialized, see Brief for United States as *Amicus Curiae* 21, n. 13, and is possibly inconsistent with the Department's earlier position, see Convention Analysis

---

[11] See Art. 32, Vienna Convention on the Law of Treaties, May 23, 1969, 1155 U. N. T. S. 331, 340 ("Recourse may be had to supplementary means of interpretation . . . when the interpretation . . . (*a*) leaves the meaning ambiguous or obscure; or (*b*) leads to a result which is manifestly absurd or unreasonable").

10504–10505.[12]

Putting aside any concerns arising from the fact that the Department's views are newly memorialized and changing, I would not in this case abdicate our responsibility to interpret the Convention's language. This does not seem to be a matter in which deference to the Executive on matters of foreign policy would avoid international conflict, cf. *Itel Containers Int'l Corp.* v. *Huddleston*, 507 U. S. 60, 76 (1993) (acknowledging that "the nuances of foreign policy 'are much more the province of the Executive Branch and Congress than of this Court'" (quoting *Container Corp. of America* v. *Franchise Tax Bd.*, 463 U. S. 159, 196 (1983))); the State Department has made no such argument. Nor is this a case in which the Executive's understanding of the treaty's drafting history is particu-

————————

[12] The State Department explained to the Senate at the time it sought ratification of the Convention that the "fundamental purpose of the Hague Convention" was "to protect children from wrongful international removals or retentions by persons bent on obtaining their physical and/or legal custody." Convention Analysis 10504. I find it quite unlikely, in light of its framing of the "fundamental purpose" of the Convention, that the State Department would have agreed at the time that a removal was "wrongful" within the meaning of the Convention when a parent *with physical custody* of a child took that child to another country, even when that removal was in violation of a restriction on the custodial parent's travel rights. See also Brief for Eleven Law Professors as *Amici Curiae* 4–5, n. 7. Even more telling, however, is the fact that, in a response to a questionnaire used by the Convention's drafters in preparing the treaty, the United States characterized a *ne exeat* right as one with "the purpose of preserving the jurisdiction of the state in the custody matter and of safeguarding the visitation rights of the other parent." 1980 Conférence de La Haye de droit international privé, Enlèvement d'enfants, Replies of the Governments to the Questionnaire, in 3 Actes et Documents de la Quatorzième session, pp. 85, 88 (1982). Such a description is inconsistent with the Department's current position that a *ne exeat* clause is a freestanding right of custody within the meaning of the Convention. See Brief for United States as *Amicus Curiae* 7.

larly rich or illuminating.[13]  See *Factor,* 290 U. S., at 294–295 (observing that "diplomatic history"—"negotiations and diplomatic correspondence of the contracting parties relating to the subject-matter"—is entitled to weight). Finally, and significantly, the State Department, as the Central Authority for administering the Convention in the United States, has failed to disclose to the Court whether it has facilitated the return of children to America when the shoe is on the other foot.[14]  See Brief for United States as *Amicus Curiae* 4, n. 3 (describing responsibilities of the Central Authority).  Thus, we have no informed basis to assess the Executive's postratification conduct, or the conduct of other signatories, to aid us in understanding the accepted meaning of potentially ambiguous terms.  See *Zicherman* v. *Korean Air Lines Co.*, 516 U. S. 217, 227–228 (1996) (considering "postratification conduct of the contracting parties"); *Charlton* v. *Kelly*, 229 U. S. 447, 468 (1913) (affording "much weight" to the fact that the "United States has always construed its obligation" under a treaty in a particular way and had acted in accord).

Instead, the Department offers us little more than its

---

[13] This only underscores what seems quite clear: Whatever contemporary international consensus the Court claims has now emerged, "that view was not generally formulated when the Convention was drafted in 1980." *Ante*, at 14.  I understand the Court's reference to contemporary consensus to depend on the views of contemporary scholars and individual signatory states developed postratification, including the views of the Special Commission, a voluntary *post hac* collective body with no treaty-making authority, see *ibid.*  Even assuming that the Court is correct that consensus has emerged after the Convention was written and ratified that *ne exeat* rights *should* be "rights of custody," in my view this provides no support at all for the position that the Convention's drafters had these types of rights in mind and intended for the Convention to treat them as rights of custody.  To the contrary, I think it tends to prove the opposite point.

[14] This is somewhat surprising given that in 1999 the Department made 212 outgoing applications for return of children to the United States and made 85 such requests in 2003.  Lowe Analysis 479.

own reading of the treaty's text. Its view is informed by no unique vantage it has, whether as the entity responsible for enforcing the Convention in this country or as a participating drafter. The Court's perfunctory, one-paragraph treatment of the Department's judgment of this matter only underscores this point. *Ante*, at 11–12. I see no reason, therefore, to replace our understanding of the Convention's text with that of the Executive Branch.

*Views of foreign jurisdictions.* The Court believes that the views of our sister signatories to the Convention deserve special attention when, in a case like this, "Congress has directed that 'uniform international interpretation' of the Convention is part of the Convention's framework." *Ante*, at 12 (quoting 42 U. S. C. §11601(b)(3)(B)). This may well be correct, but we should not substitute the judgment of other courts for our own. See *Olympic Airways* v. *Husain*, 540 U. S. 644, 655, n. 9 (2004). And the handful of foreign decisions the Court cites, see *ante*, at 12–13, provide insufficient reason to depart from my understanding of the meaning of the Convention, an understanding shared by many U. S. Courts of Appeals. See, *e.g.,* 542 F. 3d 1081 (CA5 2008) (case below); *Gonzalez* v. *Gutierrez*, 311 F. 3d 942, 949 (CA9 2002) (parent's right to "refuse permission for his children to leave Mexico" "hardly amounts to a right of custody, in the plainest sense of the term"); *Croll,* 229 F. 3d, at 140 ("If we were to enforce rights held pursuant to a *ne exeat* clause by the remedy of mandatory return, the Convention would become unworkable. . . . It does not contemplate return of a child to a parent whose sole right—to visit or veto—impose no duty to give care"); *Fawcett* v. *McRoberts*, 326 F. 3d 491 (CA4 2003). Indeed, the interest in having our courts correctly interpret the Convention may outweigh the interest in having the *ne exeat* clause issue resolved in the same way that it is resolved in other countries. Cf. *Breard* v. *Greene*, 523 U. S. 371, 375 (1998) *(per curiam)* ("[W]hile

we should give respectful consideration to the interpretation of an international treaty rendered by an international court with jurisdiction to interpret such, it has been recognized in international law that, absent a clear and express statement to the contrary, the procedural rules of the forum State govern the implementation of the treaty in that State").

I also fail to see the international consensus—let alone the "broad acceptance," *ante*, at 12—that the Court finds among those varied decisions from foreign courts that have considered the effect of a similar travel restriction within the Convention's remedial scheme. The various decisions of the international courts are, at best, in equipoise. Indeed, the Court recognizes that courts in Canada and France have concluded that travel restrictions are not "rights of custody" within the meaning of the Convention. *Ante*, at 13–14.

And those decisions supportive of the Court's position do not offer nearly as much support as first meets the eye. For example, the English High Court of Justice decision on which the Court primarily relies, *ante*, at 12, appears to have decided a different issue. True, that court considered the effect of a similar travel restriction on both parents following the award of "custody" to the child's mother. *C. v. C.*, [1989] 1 W. L. R. 654, 656 (C. A.). But the family court had also decreed, at the time it awarded "custody" to the mother, that both parents would remain "'joint guardians'" of the child. *Ibid.* Moreover, in the time between the mother's removal of the child and the father's petitioning for his return, the father had returned to the Family Court in Sydney, obtained an order for the child's return, and received immediate custody of the child. *Ibid.* Comparable facts do not exist in this case. Cf. *Olympic Airways*, 540 U. S., at 655, n. 9 (noting that "we are hesitant" to follow decisions of sister signatory courts when "there are substantial factual distinctions between" the cases).

Similar factual distinctions—involving, typically, joint guardianship rights or shared decisionmaking rights—are present in other of the foreign cases relied upon by the Court and Mr. Abbott.[15]

Those foreign courts that have reached a position consistent with my own, the Court is right to point out, have also done so in slightly different factual scenarios. *Ante*, at 13–14. The Supreme Court of Canada, for example, first encountered a *ne exeat* provision as part of an interim custody order in *Thomson* v. *Thomson*, [1994] 3 S. C. R. 551, 589–590, 119 D. L. R. (4th) 253, 281. Although the Canadian high court concluded that a removal in breach of the temporary travel restriction was wrongful, it emphasized the interim nature of the provision, see n. 9, *supra*, and explained that the case would be different with a permanent order. See *Thomson*, 3 S. C. R., at 589, 119 D. L. R., at 281 ("Such a [permanent] clause raises quite different issues. It is usually intended to ensure permanent access to the non-custodial parent. The right of access is, of course, important but, as we have seen, it was not intended to be given the same level of protection by

_____

[15] See Bundesverfassungsgericht [BVerfG] [Fed. Constitutional Ct. of Germany] July 18, 1997, 2 BvR 1126/97, ¶¶13–15 (considering *ne exeat* provision with respect to a noncustodial parent who also had joint authority to decide major life decisions for the child); *M. S. H.* v. *L. H.*, [2000] 3 I. R. 390, 401 (Sup. Ct. of Ireland) (evaluating effect of *ne exeat* provision when parents had shared "rights of parental responsibility," including " 'all the rights, duties, powers, responsibilities and authority which, by law, a parent of a child has in relation to a child and his property' "); *Sonderup* v. *Tondelli*, 2001(1) SA 1171, 1177–1178 (Constitutional Ct. of South Africa (2000)) (evaluating removal where parents were both granted "joint guardianship" of the minor); CA 5271/92 *Foxman* v. *Foxman*, [1992] §3(C) (Sup. Ct. of Israel) (examining whether removal was wrongful in the context of a custody and visitation agreement that provided broadly that "each parent needs the consent of the other to every significant change in the children's residency").

the Convention as custody").[16]  The Canadian Supreme
Court later affirmed this important distinction in *D. S.* v.
*V. W.*, [1996] 2 S. C. R. 108, 139, 134 D. L. R. (4th) 481,
503 (rejecting argument that "any removal of a child
without the consent of the parent having access rights"
should authorize return remedy because such a reading of
the Convention would "indirectly afford the same protec-
tion to access rights as is afforded to custody rights").

In sum, the decisions relied upon by the Court and Mr.
Abbott from our sister signatories do not convince me that
we should refrain from a straightforward textual analysis
in this case in order to make way for a "uniform interna-
tional interpretation" of the Convention.    42 U. S. C.
§11601(b)(3)(B).    There is no present uniformity suffi-
ciently substantial to justify departing from our independ-
ent judgment on the Convention's text and purpose and
the drafters' intent.

## V

At bottom, the Convention aims to protect the best
interests of the child.  Pérez-Vera Report ¶25, at 432.
Recognizing that not all removals in violation of the laws
of the country of habitual residence are contrary to a
child's best interests, the Convention provides a powerful
but limited return remedy.  The judgment of the Conven-
tion's drafters was that breaches of access rights, while
significant (and thus expressly protected by Article 21),
are secondary to protecting the child's interest in main-
taining an existing custodial relationship.

---

[16] The Canadian high court also observed that construing a perma-
nent travel restriction on one parent as creating a right of custody in
the other has "serious implications of the mobility rights of the custo-
dian." *Thomson,* 3 S. C. R., at 590, 119 D. L. R., at 281.  A French
Court of Appeals made a similar observation in *Attorney for the Repub-
lic at Périgueux* v. *Mrs. S*, T. G. I. Périgueux, Mar. 17, 1992, Rev. cr. dr.
internat. Privé 82(4) Oct.–Déc. 1993, 650, 651–653.

Today, the Court has upended the considered judgment of the Convention's drafters in favor of protecting the rights of noncustodial parents.  In my view, the bright-line rule the Court adopts today is particularly unwise in the context of a treaty intended to govern disputes affecting the welfare of children.

I, therefore, respectfully dissent.